# Seat *v.* McWhirter.

## (*Nashville.*  March 22, 1894.)

1. DEEDS.  *Capacity.*  *Undue influence.*

   Where the maker of a voluntary conveyance is capable of doing the act, and there is no fraud, no concealment, and no advantage taken, the Court will not interfere.  (*Post, pp. 558–569.*)

   Cases cited and approved: Hadley *v.* Latimer, 3 Yer., 537; Coffee *v.* Ruffin, 4 Cold., 514.

2. SAME.

   The law does not require that persons shall be able to dispose of their property with judgment and discretion in order to the validity of a conveyance.  It is sufficient if they understand what they are about.  (*Post, p. 569.*)

3. SAME.

   The fact that grantees advised and encouraged the execution of the voluntary deeds does not impair the validity of the instruments, unless the free agency of the grantor was destroyed.  (*Post, pp. 569, 570.*)

4. WIFE'S RENTS.

   Where wife leaves entire management of her property to her husband, and does not, during his life, seek to charge him with rents, his representative cannot be called on to account for such rents and interest.  (*Post, pp. 556, 557.*)

   Cited and approved: Lishey *v.* Lishey, 6 Lea, 418.

---

### FROM MONTGOMERY.

---

Appeal from Chancery Court of Montgomery County.  GEO. E. SEAY, Ch.

LEECH & SAVAGE for Seat.

BURNEY & GHOLSON and VERTREES & VERTREES for McWhirter.

McALISTER, J. This bill was filed in the Chancery Court of Montgomery County by Mrs. S. M. Seat to cancel two deeds made by her to the defendants, A. J. and F. P. McWhirter. The grounds of the relief asked are incapacity upon the part of complainant and fraud practiced by the defendants.

The Chancellor found, upon the facts, that no fraud had been practiced by the defendants, but he ordered the deeds canceled, upon the ground that Mrs. Seat did not at the time understand what she had done, but meant to do a wholly different thing.

The complainant, Mrs. S. M. Seat, is the widow of S. B. Seat, who died intestate at Clarksville, Tenn., on February 5, 1893. The defendants, A. J. and F. P. McWhirter, are half-brothers of S. B. Seat, the intestate. The property conveyed in the two deeds from Mrs. Seat to the McWhirters is estimated to be worth about seventy thousand dollars, and consists of an orange grove in Florida, her residence in Clarksville, a pear orchard in Montgomery County, a lot in Clarksville, two tracts of land in Davidson County, and some shares of stock in a turnpike company, and Union Wharf stock. The grounds of relief are thus stated in the bill, viz.:

"When these conveyances were made, she was in much trouble; her husband had been dead less than one week; she was incapable of reasoning intelligently and with any judgment about business matters; was unacquainted with business, having never attended to any before the death of her husband. She was approached by the defendants, in whom she had implicit confidence; was told by them that this would be the best way to wind up the estate of her husband, their brother; they manifested the greatest love and consideration for her, and made her believe that they were considering her interests, and were trying to do the best for her. She did not have the advice of counsel or friends, apart from these defendants, and did not understand what had been done until after it was all over. She was induced to say, in the conveyances named, that it was the expressed wish of her husband, when, as a matter of fact, no such wish was ever expressed by him to her, but she was told this by the defendants. These defendants had the paper prepared by their attorney, at his office, and, while it was read over to her, she did not understand it as she now does, and was at the time incapable of understanding any thing of the magnitude and importance of these transactions. After these papers were prepared, and after they had been put to record, the defendants, evidently conscious of the wrong that had been done her, came to her again, and said there had been much talk about these transactions, and said they wanted her

to acknowledge them again in the presence of some gentlemen, and again assured her that it would be best for her; that it was entirely to her interest; that they were interested in her welfare; that they were only trying to carry out the oft-expressed wish of her dead husband, and, to avoid any trouble, it would be well for her to say, in the presence of witnesses, that she was entirely satisfied with what had been done. Up to this time complainant had not fully understood just what had been done. She had not had the advice of an attorney. She did not know her rights in the premises, and would not have understood it even if at that time explained to her by a friend.

"She again states to the Court that never in his life did her husband say to her that, in the event of his death before her, that she should do as the papers executed recited. This was a matter invented and gotten up entirely and wholly by these defendants. They obtained her confidence, as before stated, called her their dear sister, and made her believe that nothing was to be considered but her welfare. Complainant has realized how she has been defrauded and ,imposed upon by the defendants. She has had the transactions and their magnitude explained to her, and she again says to your Honor that all these transactions were at that time entirely misunderstood by her; that she did not know that she was divesting herself of all the property she had; that she did not know any thing about it in fact, and that she had been de-

35—9 P

ceived, has been defrauded out of nearly one hundred thousand dollars' worth of property by these defendants, and that she desires the cancellation of these fraudulently obtained conveyances."

The substance of the answer, as condensed by counsel, is that the property held by Mr. Seat in every capacity was really his; that he never received more than $16,000 of property by or for his wife, the complainant, and all over that was his; that he was heavily involved in debt, mostly as surety or indorser, and, in order to protect his property, and effect advantageous compromises with his creditors, he covered up his property from the close of the war until about 1890, by assuming to hold it as " trustee " for his wife; that about 1890 or 1891 he had compromised all his debts, and forthwith began to take the property out from under the trust, and had done so as to most of it at the time of his death; that it was Mr. Seat's wish and desire that the defendants, his only brothers, should have the property—except $7,200—subject to a life estate for Mrs. Seat in the home-place, furniture, etc., and a proper support out of his estate—that is to say, that she should have the home-place, furniture, horses, cows, carriage, etc., for life, $7,200 in money, and one-third of the income of all the property. It avers that this desire and purpose of Mr. Seat were well known to Mrs. Seat, and that she agreed and desired to carry them out; that, in pursuance of that agreement, she did execute the deeds; that she did have competent and hon-

orable counsel, knew what she was doing, and intended and desired to do precisely what she did do; that a few days thereafter, being informed that certain of her expectant heirs were making trouble, and trying to make Mrs. Seat dissatisfied, they went to her, and proposed to make any alteration or change she desired—to cancel the deeds if she preferred; that she disclaimed that she was dissatisfied, and expressed no desire for any alteration or change whatsoever; that they left their proposition open, with the understanding that if she desired any change or cancellation, she should notify them, and they would make it; that she gave no notice, but the bill was filed five days thereafter, their first intimation that she desired any thing being service of process in the case; that they acted throughout in absolute good faith, and did not overreach, mislead, or deceive her in any way; that what she did when she made the deeds was what she ought to have done, what Mr. Seat desired, what she knew he desired, and what she herself desired and intended, to do; and that the case is not her case, but really that of her relatives, the Andersons, who seek in this way to realize the expectations which were disappointed by the making of the two deeds."

The Chancellor found that Mr. Seat died intestate, having real and personal property in his name as trustee for his wife, the complainant; that the real estate in Florida descended to Mrs. Seat; that Mrs. Seat was old and infirm, and

deeply distressed by her husband's death, and that, for some time thereafter, because of this shock and the distress of mind incident to it, and her former dependence on him, she was incapable of understanding and comprehending transactions of the magnitude of the one in question; that, while in this frame of mind, and not understanding what she was doing, and believing that she was doing a wholly different thing, she executed, without consideration, the two deeds sought to be canceled; that the allegations of fraud in the bill are not sustained by the evidence; that she conveyed the property mentioned in the deeds without intending to do so.

And the Court decreed, upon these findings, that she (complainant) executed the two deeds ignorantly, and without understanding the real contents and tenor of the same, without consideration, and with the belief that she was doing an entirely different act by the execution of the papers; that the deeds be canceled and rescinded, and the title to the property in Tennessee be divested out of the defendants, and vested in complainant, as it was before the execution of said deeds, and the title to the Florida property be divested out of them, and vested in complainant the same as it was before the deeds were executed, in so far as the Court had jurisdiction to do so; and that the defendants should execute a deed reconveying said property to Mrs. Seat within thirty days after the adjournment of the Court, and that the Clerk and

Master should do so in their names, if they failed
to convey;. and that the defendants, the Messrs.
McWhirter, pay all the costs.

The defendants, A. J. and F. P. McWhirter,
appealed from the whole decree. Mrs. Seat ap-
pealed from the finding of the Court that she is
not entitled to relief on the ground that the deeds
were obtained by fraud.

The defendants have filed the following assign-
ment of errors:

"The Court erred in finding: (1) That Mr. S.
B. Seat, when he died, held the real and personal
estate in his name as trustee for his wife, the
complainant; (2) that at the time the deeds were
executed, Mrs. Seat was incapable of understanding
and comprehending transactions of the magnitude
of the one in question; (3) that Mrs. Seat did not
understand what she was doing when she made
the conveyances now sought to be canceled; (4)
that she conveyed the property mentioned in the
deeds without intending to do so; (5) that she
executed the conveyances of, and to, these lands
mentioned in the deeds, believing she was doing
a wholly different thing.

"The Court erred in decreeing: (6) That Mrs.
Seat executed the said deeds ignorantly and with-
out understanding the real contents and tenor of
the same, without consideration, and under the
belief that she was doing an entirely different act
by the execution of said deeds; (7) that the deed
be canceled and the title to the property therein

mentioned be divested out of A. J. and F. P. McWhirter and be vested in Mrs. Seat, as it was before the deeds were made; (8) that said defend: ants make a reconveyance within thirty days from the adjournment of the 'Court, or, failing to do so, the Clerk and Master make one in their names; (9) that the defendants pay the costs of this cause.

"The Court erred in not decreeing: (10) That the complainant's bill be dismissed; (11) that Mrs. Seat did fully and clearly understand and compre-- hend the nature and object of the deeds, and that she then executed them for the purpose and object therein recited and expressed; (12) that no relief can be given by decree upon the pleadings, upon any other ground than that the conveyances had been procured by deception or fraud; and, as the Court found that the evidence did not sustain the allegations of fraud, that the bill be dismissed; (13) that the conveyances sought to be canceled are good, valid, and shall stand."

The deed executed by Mrs. Seat to the McWhirters, conveying the Tennessee property, recites, viz.:

"The transfer and conveyance of, and relinquishment of claims to, all the above-described property, is made for the following reasons, and upon the following consideration: There was an understanding between S. B. Seat, during his life-time, and Mrs. S. M. Seat, his wife, that, in case of the death of said S. B. Seat, in the life-time of his wife, S. M. Seat, that all property of every de-

scription held by him, whether as trustee for his wife or otherwise, should go to his brothers, A. J. and F. P. McWhirter, after giving her a home for life, on the house and lot where they live at his death, and making out of his estate ample allowance for her maintenance and support during her life, in the same style and comfort in which she had been accustomed to live. It was also agreed and understood between them, the said S. B. Seat and his wife, S. M. Seat, that the sum of $7,200, which had come to the hands of her husband from the estate of her brother, Matt Anderson, should be paid to her out of the estate of her husband. * * * To the end therefore that this agreement may be fully carried out, it is hereby understood and agreed between the parties to this instrument, that Mrs. S. M. Seat shall, for her natural life, occupy the house where she now lives, free from all rents and charges, and that the taxes and insurance and repairs shall be paid by the said A. J. and F. P. McWhirter, and that she shall have, for her life, the use and benefit of all the furniture in the house, horses, carriages, cows, and such other articles or things on the place, as she may require for her comfort and house-keeping; and, in addition to the above, the said A. J. and F. P. McWhirter are to pay to the said S. M. Seat, annually, during her life-time, the sum of $1,500 for her support and maintenance, or more if it should be required for maintaining her comfortably in the style which she has been

accustomed to live; and it is also understood and agreed that the said A. J. and F. P. McWhirter are to pay the said S. M. Seat the sum of $7,200, in such payments as she may require; and for the payment of such annual sum for her support and maintenance, and for the payment to her of the said $7,200, as above stated, a lien is hereby expressly retained on all the property, real and personal, hereby conveyed."

The deed to Florida property recites the following consideration: "One dollar to her in hand paid, and in accordance with an understanding and agreement between her and her deceased husband, S. B. Seat, the said Mrs. S. M. Seat has granted," etc. This deed was put to record in Florida on February 24, 1893.

In entering upon this investigation, the first question that presents itself is, whether Mrs. Seat, at the date of the execution of these conveyances, was possessed of sufficient intelligence to comprehend the nature of the transaction. Secondly, whether, as a matter of fact, she did understand the transaction, and voluntarily executed the conveyances, without fraud or undue influence on the part of the defendants. A preliminary question, however, which has been much discussed at the bar, must be settled, and that is whether the property conveyed by Mrs. Seat to the Mc-Whirters was the property of S. B. Seat or was the property of Mrs. Seat, or such as arose from the accretions of her separate estate. A large

volume of testimony has been taken in elucidation of this issue. The contention of complainant's counsel is that all this property belonged to Mrs. Seat absolutely, and that it is unnatural and unreasonable that a woman in her right mind would understandingly give away to persons who are not natural objects of her bounty, such a large amount of property.

On the other hand, the insistence of defendant's counsel is that the property conveyed was the absolute estate of S. B. Seat, although held by him, for many years prior to his death, under the guise of a trusteeship for his wife, and that the conveyance of Mrs. Seat to A. J. and F. P. McWhirter was simply in execution of the oft-expressed desire of her husband that his half-brothers should inherit his estate after making an ample allowance for the support of his wife.

We find from the record that S. B. Seat, about the close of the war, was indebted several hundred thousand dollars, and, at that time, he was probably worth about $25,000 or $30,000, which was realized from the sale of his real estate. In order to effect advantageous compromises with his creditors, he covered up his property, by adopting a supposititious trusteeship for his wife. Mr. Seat carried on his financial operations under this device until 1891, or until all his old debts had been paid or adjusted, when he began to withdraw his property from the cover of the trusteeship.

In 1869 Mr. Seat sent A. J. McWhirter $15,000

by express, with which to buy up $425,000 of old claims held against him, as indorser, by the Planters' Bank of Tennessee. McWhirter accomplished the purchase of this large indebtedness from the bank, and transmitted the bills and notes so purchased to his brother, S. B. Seat. The latter brought suit in Chicago on some of this paper, procured judgment, and caused execution to be levied on certain valuable lands, which were sold, and bought in the name of A. J. McWhirter and Mrs. C. H. Smith as the purchasers, and the title was vested in them by deeds of conveyance. Mr. Seat afterwards sold this Chicago property for $26,500. One-half of this sum, or $13,250, belonged to Mr. Seat, and was realized by him from this sale. The property called the home-place in the record, and worth probably $10,000, was bought at a chancery sale in 1867. It was bid off in the name of Matt Anderson, but. Mr. Seat furnished the money to pay for it. There was never any vestiture or divestiture of title. Mr. Seat took possession immediately, and held it continuously until his death. Mr. Seat also purchased an orange grove in Florida. He first purchased a two-fifths interest in 1881, and the remaining interests at later dates. These purchases were made by him, but the deeds conveyed title to him as trustee for his wife. In April, 1891, after he had compromised his debts, Mrs. Seat conveyed the whole title to him individually, for the purpose of getting the title out of him as trustee.

Louis Anderson, witness for complainant, states that when Mrs. Seat signed the deed in April, 1891, whereby the title to the orange grove was passed from Mr. Seat, trustee, to Mr. Seat individually, she asked Mr. Seat why he did not do away with the trusteeship of the Tennessee property also, and he replied: "We will let that stand as it is." Mrs. Seat evidently knew that the trust was employed by Mr. Seat to protect his property while he was compromising his debts. Indeed, Mrs. Seat was asked, on cross-examination, referring to his trusteeship: "Was not the reason of that this: That Mr. Seat had failed, and he felt that it was largely due to his being involved through others, and that the debts were entirely too large for him to handle, and it was necessary for him to put himself in a position so that he could make a reasonable compromise?" She answered: "Yes, sir; I expect it was."

It is insisted by counsel for complainants that Mr. Seat had neither money nor property, but that Mrs. Seat's estate, and its investments and reasonable profits, afforded largely more than enough to pay for all the property purchased, including the Florida property, and their contention is that the property, at the death of Mr. Seat, all belonged to Mrs. Seat. We will now inquire what property Mr. Seat owned individually, and what he received from his wife during the time he was acting as trustee.

First, we are of opinion the record shows that

Mr. Seat, after converting his real estate at the close of the war, was probably worth $25,000 in money. It is also shown that he realized $13,250 from the sale of the Chicago property. He also received commissions amounting to $1,000 for services as administrator of Matt Anderson's estate; and also commissions of $1,000 as administrator of George Anderson's estate; also $2,212 commissions as executor of James Anderson's estate; also $1,500 charges against Susie Anderson, retained out of the funds of the estate in his hands; also $2,900 from the estate of his step-father and mother, Mr. and Mrs. G. W. McWhirter; also $2,750 excess of $2,000 credited on account of commissions in purchase of land from A. J. McWhirter, December 29, 1881. Mr. Seat purchased for himself two town lots in Clarksville, in 1882, at the price of $743, which he afterwards sold, in 1891 or 1892, at a profit of $2,645. He also received rent every year from the place he had purchased in 1881 from A. J. McWhirter, and also from the Sam Anderson place.

Our next inquiry is in respect to the property received by Mr. Seat during these years which belonged to his wife.

First, Mr. Seat collected from the estate of Jas. Anderson, who was the father of Mrs. Seat, $6,-139.65, and from the personal estate of Matt Anderson, who was Mrs. Seat's brother, $2,730.15, and from the sale of the Matt Anderson real estate, $7,169.30, making together the sum of $16,039.40.

It is insisted, however, by complainant's counsel

that Mr. Seat was chargeable with the rents and income arising from Mrs. Seat's real estate. This contention is not tenable, for two reasons—to wit, first, the proof shows the real estate in question was simply a general estate; secondly, if it had been vested in Mrs. Seat, as a technical separate estate, they lived together, and the entire management of the estate was left to Mr. Seat. Mrs. Seat never sought to. charge him with these rents during his life, and his representative cannot be called on to account for the interest or rents and profits. *Lishey* v. *Lishey*, 6 Lea, 418; *Edgar Jones, Guardian*, v. *Union Bank and Trust Co.*, MS., Nashville, December Term, 1893.

We are also of opinion that it appears from the facts in this record that, when Mr. Seat had settled his old debts, he abandoned the trusteeship and began to do business as an individual, and use the trust property as his own. As evidence of this change in his whole course of business, about two years before his death, he changed the form of his account in bank from S. B. Seat, trustee, to S. B. Seat. In March, 1891, Mrs. Seat joined in a deed conveying the legal title to the orange grove to him individually. In 1892 he settled with his wards, and conveyed to them, in payment of that individual indebtedness, two houses and lots in Clarksville, which he held as trustee. In 1884, while compromising his debts, he purchased with his own money, two lots in Nashville, taking the title to himself, as

trustee. In January, 1892, he sold these lots, taking notes payable to himself as an individual, and not as trustee. Many other facts and circumstances could be mentioned as evidence of this change in his course of dealing with his property.

We are of the opinion that, at the date of Mr. Seat's death, he was the owner of all the property, excepting the farm in the bend, which is not included in the McWhirter conveyances, and the $16,039.40 received from the estates of Jas. and Matt Anderson.

It appears from the record that the most affectionate and fraternal relations had always existed between Mr. Seat and his two half-brothers, who were the only relatives he had living bound to him by the ties of blood. It also appears that the most cordial and friendly relations had always existed between Mrs. Seat and the McWhirters. There is evidence tending to show that Mr. Seat had expressed a desire that his estate should be inherited by his half-brothers, after making an ample allowance for his wife. There is also evidence tending to show that Mrs. Seat knew the wishes of her husband in respect to the disposition of his property, and desired to have them carried out.

The disposition of these preliminary questions brings us to the consideration of the main issue in the case—to wit, the execution of the instruments which are sought to be annulled. It is insisted by defendants that these deeds were executed

by Mrs. Seat understandingly, in accordance with Mr. Seat's wishes, and there was no misapprehension, deception, or fraud.

It appears from the record that Mrs. Seat is a lady sixty-seven years of age. She is described by Mrs. Bryce Stewart, one of the principal witnesses, "as a woman of fine mind; reads a great deal; never impulsive and rarely demonstrative; strictly honest and truthful; and, further, that she is a retiring woman, and talks very little." Louis Anderson, her nephew, testifies that she is ignorant of all forms of business, but that she is a woman of unusual intelligence and good judgment, and was always consulted by her husband when he contemplated an investment. Mrs. Stewart was asked if Mrs. Seat's condition mentally, after her husband's death, was other than natural under all the circumstances. Her reply was: "No, I think not; am sure not." Such was the mental and personal character of Mrs. Seat, as portrayed by two of her principal witnesses.

On February 13, 1893, succeeding the death of Mr. Seat, which occurred on February 4 of the same year, Messrs. A. J. and F. P. McWhirter went to Clarksville, and on February 15 the transfer of the property was agreed upon. The question arose in respect to the counsel that should be employed to draft the instruments. They readily agreed upon Col. John F. House, who had always acted as Mr. Seat's counsel. Mrs. Seat remarked: "Get Mr. House, and if you cannot find

Mr. House, get Mr. Savage, and have the papers drawn." F. P. McWhirter stated that Colonel House could represent both sides in the matter. Colonel House was accordingly employed, and he states that, at the time of his retainer, Mr. Fount McWhirter remarked: "We want you to give Mrs. Seat's side attention in this matter as well as ours." When they had all assembled at the residence of Mrs. Seat, Mr. F. P. McWhirter again remarked to Colonel House, in the presence of Mrs. Seat, that Colonel House was there to act for both parties. Col. John F. House, in his deposition, describes what occurred at the residence, as follows:

"*Question* 12. Now state, when you got to Mrs. Seat's, what then occurred?

"*Answer.* When we got there Mrs. Seat was there, and A. J. and F. P. McWhirter, who went there with me. We went into the room where Mrs. Seat was, and I spoke to her, giving her the usual salutation, and this matter was all talked over in her presence—what was to be done, what provision was to be made for her, what was to be conveyed to them; and it was spoken of as understood between her and Mr. Seat what was to be done. Mrs. Seat did very little talking, but the McWhirters stated over in her presence what they had stated in my office—substantially the same they had said to me in my office. That was, the portion of it that was to be given her. And one of the McWhirters remarked to me in Mrs. Seat's

Seat *v.* McWhirter.

presence, 'We want. you to act for Mrs. Seat as well as for us.' Well, in reference to their giving her one-third of the proceeds of the income derived from the. estate, I suggested that perhaps it would be better, if Mrs. Seat was to be provided for, that a certain sum be paid her instead of paying her one-third of the profits of the estate. I went on to say, further, that I supposed there was not much profit in that orange grove, that I understood some years it was profitable and some years it was not; and if provision was to be made for her, it ought to be made a certain sum, and not such a dependence put on the profits of the property. Of course I did not suggest as to the amount to be paid her. They all seemed to agree to it, that there should be some certain sum to go to her instead of one-third of the profits for life. Well, then 'Fount' McWhirter (I think it was) spoke up and said—I do not know whether he said he had learned it from Mr. Seat's papers or not, but he had learned it in some way—that Mr. Seat's family expenses had been about $1,800 a year, and he mentioned that sum. Mrs. Seat spoke up and said that that was too much, that she did not need that much. And they went on to discuss that, and, in talking about the matter, she spoke of the rents she got from the place up here in Davidson County. My recollection now is that these rents amounted to about $800 or $900. Well, the discussion went on about $1,800 being too much, and finally the sum of $1,500 was agreed

36—9 P

upon as about what she would need. And in talking the matter over in that way, it was all spoken about there before her that they were to pay her this $7,200 that Mr. Seat got, as I understood from their conversation, from Matt Anderson's estate. That was to be paid her absolutely, and then this $1,500 a year, and she was to have the furniture and the house and the carriage, and they were to pay—my recollection now is—the insurance and taxes on the place. Now, after this conversation, I then remarked, 'I think I understand what you all want,' and I got up and left."

Also:

"*Question* 2. You say that something was said about Mr. and Mrs. Seat understanding that [at] his death the McWhirters were to have the property. Was this not said by the McWhirters, and not by Mrs. Seat?

"*Answer.* Yes, the McWhirters made the statement in Mrs. Seat's presence, and I understood her to assent to it.

"*Question* 4. Did not the McWhirters say in Mrs. Seat's presence, both on the occasion when you were there with them, and on the occasion when Messrs. McRea and Lupton were there; and did not George McWhirter, on the occasion last [mentioned], also say, in substance, as follows: 'We want to save Mrs. Seat all trouble in settling up this estate, and we want to see that she is properly cared for and maintained?'

"*Answer.* It was stated by the McWhirters, one or both, on one of the occasions, perhaps both, that they wished the amplest provisions made for Mrs. Seat, so that she should want for nothing, or have no trouble about her comfortable maintenance, but I do not remember their saying that they wished her to have no trouble about settling up the estate."

It will be observed that Colonel House states that this disposition of the property was spoken of on that occasion as understood between Mr. and Mrs. Seat. On cross-examination, Colonel House was asked if this remark was not made by the Mc-Whirters, and not by Mrs. Seat. He replied: "Yes, the McWhirters made the statement in Mrs. Seat's presence, and I understood her to assent to it." Again, it was Colonel House's suggestion that a fixed, definite annuity should be provided for Mrs. Seat, rather than that she should depend upon one-third of the very irregular income of the estate. This was on account of the fact. that the pear orchard had never produced any thing, and the orange grove in Florida sometimes failed to pay expenses.

Mrs. Seat does not remember the interview described by Colonel House, but she admits the subjects just mentioned were discussed at the final interview, when the deeds were signed. Colonel House, in the preparation of the deeds, inserted two clauses, especially designed for the protection of Mrs. Seat —to wit, first, that she should receive $1,500 per

annum, and more, if necessary to support and main-
tain her properly. Secondly, that all payments due
for her support should be liens on all the Tennes-
see property conveyed. It appears that, on the day
following the first interview, Colonel House, having
prepared the deeds, took them to Mrs. Seat to be
executed. All the parties were present. Colonel
House states that he read over the deeds clearly
and slowly. That Mrs. Seat expressed herself as
satisfied, and signed them. C. B. Ewing, the Clerk
who took her acknowledgment, states that, when he
came in, Colonel House said: "I have explained
them fully, and she understands their contents;"
and that Mrs. Seat, in reply, said to him: "I un-
derstand and acknowledge them." Colonel House
was asked: "What were the indications as to Mrs.
Seat's mental capacity at the time of their inter-
view?" He answered: "Well, I would say that it
did not occur to me to question her capacity. She
did not talk much, but, of course, I inferred that
was attributable to her recent bereavement. She
seemed, as far as I could judge, to be all right. I
saw nothing to the contrary, or had any suspicion
to the contrary."

Judge Tyler was called as a witness by counsel
of complainant to testify in respect to her inca-
pacity. Judge Tyler, as Judge of the County
Court, called at Mrs. Seat's residence, the day the
deeds were executed, and took her acknowledg-
ment as surety upon the administrator's bond.
This witness was interrogated especially as to

Seat *v.* McWhirter.

Mrs. Seat's mental condition, and said she looked subdued and very sad, but that he could not speak as to her mental condition. The conveyance to the McWhirters was made after Judge Tyler's visit—on the same day. It is true, that one of the witnesses to the deeds, Mr. J. B. Osborn, did testify that Mrs. Seat said nothing to anybody, and acted in a dazed sort of way, and gives it as his impression that she lacked understanding at the time. This witness does not appear to have known Mrs. Seat very well, or to have been much in her company. Upon the other hand, Mr. Bryce Stewart, Mr. Garrard, Mr. McRae, Mr. Louis Anderson, Mr. Martin, and Mr. Ford— all old friends and some of them relatives of Mrs. Seat—were examined as witnesses in this case, and not one of them has testified even to a suspicion of Mrs. Seat's mental unsoundness or want of capacity or understanding.

Another phase of this case remains to be noticed. It appears that, after these conveyances were executed and registered, some dissatisfaction arose among the relatives of Mrs. Seat who were expectant heirs to this estate. It appears that a niece of Mrs. Seat talked to Mrs. Seat so much upon this subject, that, in the language of Mrs. Seat, it "nearly ran her wild." Mrs. Seat herself, up to this time, had expressed no dissatisfaction whatever, but serious imputations were cast upon the McWhirters by some of Mrs. Seat's relatives and friends.

The McWhirters returned to Clarksville and arranged an interview with Mrs. Seat. Col. John F. House, Dr. Lupton (Mrs. Seat's pastor), Mr. McRae (president of a bank), and Miss Howard, all friends of Mrs. Seat, were invited to be present, and did attend the interview. Colonel House, in his deposition, describes what occurred at that interview. He states: "When I got to the house Miss Sallie Howard was in the room, Mr. Lupton, the Presbyterian minister, George McWhirter, Mr. McRae, F. P. and A. J. McWhirter. Mr. F. P. McWhirter stated to those persons present that there had been reports put out, to the effect that he and his brother had come down there and overreached Mrs. Seat, and taken advantage of her position, and got her to convey her property to them, perpetrating a fraud on her, and this imputation he did not propose to rest under; he wanted to say, in the presence of all these persons there assembled, and before Mrs. Seat, that he would not, for all he and his brother were worth, do her an injury, or do any thing in reference to that property that did not meet, with her approval, and wanted to say to her, in the presence of all these persons there, 'If you are dissatisfied with these conveyances, we stand ready to make any alteration in them you want to make—fix that property as you want it fixed, or any alteration that you want in it.' Well," says Colonel House, "he made quite a talk, protesting, or rather replying, to those charges which had been brought against him con-

·cerning the property and his methods. I cannot, ·of course, repeat every thing he said now, but he wound up what he had to say by saying: 'Now, if you are dissatisfied with this thing, my brother and I are down here prepared to make any alteration or change, or fix this thing any way you want it fixed.' Well, Mrs. Seat made no reply to that that I heard at all. Miss Sallie Howard, as I now recollect, turned to Mrs. Seat, and said: 'Mrs. Seat, why don't you say what you want done?' I did not hear any reply to that. (A. J. McWhirter testifies that Mrs. Seat's reply was, viz.: 'I have not said that I want any thing done.') George McWhirter, the son of A. J. McWhirter, then said: 'Aunt Sue, understand that this is the proposition of the McWhirters; they are willing to make any alteration in regard to this property in these deeds that you want made, or convey this property back to you, and undo all that has been done.' Well," continues Colonel House, "Mrs. Seat still made no reply. George McWhirter went on further to say: 'If you ain't prepared now, Aunt Sue, just take your own time and think about the thing. If you have got any friends you want to ·consult, consult them. If you are not prepared to make any answer now, take your own time.' At that juncture I remarked to Mrs. Seat (I was at the first of the dissatisfaction of the thing, and had not heard any thing of the sort): 'Take your own time about this thing. You may have some friend you want to consult, or may, perhaps, want

to consult some attorney about this thing. Take your own time and give your answer, or take your course.'"

Colonel House further stated that, at the request of F. P. McWhirter, he stated in brief to the persons there assembled what the deeds contained and conveyed. He also narrated the conversation and discussion between them at the time the contract was drawn. Colonel House said further that when George McWhirter made the proposition, or offer, to cancel the deeds if Mrs. Seat desired it, both A. J. and F. P. McWhirter readily assented. Without doing any thing further, this interview closed, and the parties all retired.

It appears from the record the McWhirters left Clarksville that evening with no claim of dissatisfaction from Mrs. Seat, but with the standing proposition to alter or cancel the deeds if notified by Mrs. Seat that she was dissatisfied. Up to this time Mrs. Seat herself had not expressed any dissatisfaction. The defendants received no communication that Mrs. Seat desired any thing until the bill was filed, on the third of March, 1893, charging the defendants with gross fraud and deception in obtaining the deeds, and enjoining them against disposing of the property. The Chancellor found that the allegations of fraud in the bill are not sustained by the evidence, and in this conclusion we concur. We are of opinion the charges of fraud are wholly unwarranted, and without foundation in fact. The Chancellor, however, found that

Mrs. Seat was incapable of understanding and comprehending transactions of the magnitude of the one in question, and that she executed the two deeds ignorantly and without understanding the real contents and tenor of the same, and without consideration, and with the belief that she was doing an entirely different act by the execution of the papers. We are of opinion that the great preponderance of the evidence is against the finding of the Chancellor on the proposition last announced. We are of opinion Mrs. Seat was fully capable of understanding and appreciating what she was doing when she made the deeds, and did comprehend the nature of the transaction. The law upon the subject of capacity and undue influence is, that where the maker of a voluntary conveyance is capable of doing the act, and there is no fraud, no concealment, and no advantage taken, the Court will not interpose. *Hadley* v. *Latimer*, 3 Yer., 537; *Coffee* v. *Ruffin*, 4 Cold., 514.

The law does not require that persons shall be able to dispose of their property "with judgment and discretion" in order to the validity of a conveyance. It is sufficient if they understand what they are about. *Paine* v. *Roberts*, 82 N. C., 453 (1880).

The fact that grantees advised and encouraged the execution of the voluntary deeds, does not impair the validity of the instruments, unless the free agency of the grantor was destroyed.

*Stone* v. *Wilbern,* 83 Ill., 108; *Roe* v. *Taylor,* 45 Ill., 485.

There is no ground shown in this record upon which the deeds should be annulled.

The decree of the Chancellor is reversed, and the bill is dismissed.