David M. ROBERTS, Lincoln Wilkerson, Peggy Davis, Irving Roberts and Joe Roberts, Individually, and David M. Roberts and Lincoln Wilkerson, in their capacity as Co–Administrators of the Estate of Cancel Roberts, Deceased, Plaintiffs/Appellants,

v.

Guy ROBERTS, and Nellie Birdwell, Defendants/Appellees.

Court of Appeals of Tennessee, Middle Section, at Nashville.

Oct. 25, 1991.

Application for Permission to Appeal Denied by Supreme Court March 16, 1992.

James D. White, Jr., Celina, for plaintiffs/appellants.

J.H. Reneau, III, Reneau & Reneau, Celina, for defendants/appellees.

## OPINION

TODD, Presiding Judge.

The captioned plaintiffs have appealed from a non-jury judgment dismissing their suit to set aside the transfer of a bank account and certificates of deposit by Cancel Roberts to the captioned defendants.

Defendants are the sole surviving brother and sister of Cancel Roberts who died on February 11, 1991.

Plaintiffs are the children of Cancel Roberts' deceased brother and sister.

The subjects of this controversy are:

1.  Certificate of Deposit No. 7309 in the amount of $46,841.92 issued on December 30, 1989, by Whitleyville Branch of the Jackson County Bank.
2.  Certificate of Deposit No. 2263 in the amount of $100,000 issued by the Citizens Bank on December 27, 1988.
3.  Certificate of Deposit No. 4062 in the amount of $108,503.22 issued by Macon Bank and Trust Company on July 26, 1989.
4.  Checking account No. 68000642 of Macon Bank & Trust Co. for $15,873.

Originally said certificates were issued and said account was carried in the name of Cancel Roberts.

On January 26, 1991, while in a hospital in Nashville, Cancel Roberts directed his

nephew, Dean Roberts, son of the defendant, Guy Roberts, to have the names of Guy Roberts and Nellie Birdwell put on the certificates of deposit and account.

Upon his return to his home in Red Boiling Springs, because of his need to be at work, Dean Roberts requested his father, Guy Roberts, and Aunt, Nellie Birdwell, to secure the necessary papers from the banks for complying with the request of Cancel Roberts.

Guy Roberts and Nellie Birdwell obtained from Jackson County Bank a typed request for change in the certificate of deposit at that bank. They also obtained from Citizens Bank a typed request for change and a signature card for the certificate of deposit at that bank.

The documents were delivered to Dean Roberts who returned to Nashville on January 27, 1991, with the documents which were signed by Cancel Roberts on that date in the hospital. Two of the documents signed on this occasion read as follows:

I Cancel Roberts of Route 2, Box 81, Red Boiling Springs, TN 37150 direct the Citizens Bank, Hermitage Springs Branch to place the names of my Brother and Sister being Guy Roberts and Nellie Birdwell to my Certificate of Deposit.

s/Cancel Roberts

I Cancel Roberts of Route 2, Box 81, Red Boiling Spgs, TN 37150 direct the Jackson County Bank of Whitleyville, TN to place the names of my Brother and Sister being Guy Roberts and Nellie Birdwell to my Certificate of Deposit #7309 and all other Certificates of deposit that succeed this one.

s/Cancel Roberts

On the same date, Cancel Roberts signed a "time deposit signature card" for the $46,841.92 deposit at Jackson County Bank. The card contains spaces for "individual" or "joint", and there was an "x" beside "joint". In addition to the signature of Cancel Roberts, the signatures of Guy Roberts and Nellie Birdwell appear in the signature blanks of the card. The card also contains the following: Number of signatures required for withdrawal—1.

On the same occasion, Cancel Roberts reminded Dean Roberts to have his brother and sister added to his certificate of deposit and bank account at Macon Bank and Trust Co. Again, Dean Roberts returned to Red Boiling Springs and requested his father and aunt to secure the necessary papers from Macon Bank and Trust Co., which they did.

On January 29, 1990, Dean Roberts returned to Nashville with the Macon Bank and Trust Co. papers and Cancel Roberts signed the following:

TO: MACON BANK AND TRUST CO.
   Red Boiling Springs, TN
DATE: January 29, 1990
I hereby authorize Macon Bank and Trust Co. to make the following changes to my account at your bank. I would like for you to change my Certificate of Deposit # 4062 to be payable to Cancel Roberts or Nellie Birdwell and Guy Roberts with Right of Survivorship. I also authorize you to change my checking account # 68000642 to Cancel Roberts or Nellie Birdwell and Guy Roberts with Right of Survivorship. I further authorize you to add Nellie Birdwell and Guy Roberts name to my Lock Box # 129 so that they may enter this box, jointly, at any time.

s/ Cancel Roberts

_____
Witness

_____
Witness
1–29–1990
Date

On the same date Cancel Roberts signed a signature card for the certificate of deposit and the bank account at Macon Bank and Trust Co., including signatures of Guy Roberts and Nellie Birdwell.

On January 29, 1991, the Citizens Bank added the names of Guy Roberts and Nellie Birdwell to the existing certificate of deposit at that bank.

On or about January 29, 1991, Jackson County Bank typed on the existing certificate of deposit at that bank the additional names of Guy Roberts and Nellie Birdwell

and received and filed the above mentioned signature card.

Pursuant to the directions of Cancel Roberts, Macon Bank and Trust Co. added the names of Guy Roberts and Nellie Birdwell to the certificate of deposit at that bank and received and filed the new signature card.

Cancel Roberts recovered sufficiently to return home from the hospital; but, soon afterward, on February 11, 1990, he died.

On March 22, 1991, plaintiffs filed this suit, alleging that said signatures of Cancel Roberts were obtained by undue influence, without consideration; that, at the time of signing said documents, Cancel Roberts was suffering severe physical and visual disability and was "slow mentally". It was further alleged that Guy Roberts occupied a position of confidant; that defendants procured said documents with intent to defraud plaintiffs; and that the documents were not sufficient under T.C.A. § 8–5–108 to create rights of survivorship in defendants.

The answer of defendants denies undue influence, admits that the transfers to them was a gift without consideration, admits physical ailments of Cancel Roberts but denies that he was slow mentally; admits close relationship but denies dominion or control. The answer asserts that the instruments validly vested defendants with rights of survivorship in the funds in issue.

By amendment, plaintiffs alleged that Cancel Roberts did not have the requisite mental capacity to execute said documents.

The Trial Judge filed a comprehensive and well considered memorandum opinion which resulted in a judgment dismissing plaintiffs' suit.

On appeal, plaintiffs present three issues regarding (1) mental capacity, (2) confidential relationship and (3) legal effect of the documents.

—Mental Capacity—

Plaintiffs first assert that the requisite mental capacity is not testamentary but contractual, citing *Merchants and Planters Bank v. Myers*, Tenn.App.1982, 644 S.W.2d 683; and *Lowry v. Lowry*, Tenn. 1976, 541 S.W.2d 128. Neither authority deals with the specific issue of the requisite mental capacity to execute documents creating a survivorship right in funds in the hands of a bank. However, some difference is recognized by this Court between a will or deed of gift and a contract between a bank and its depositor.

▪ The initial deposit of funds in a bank involves a contract between the bank and the depositor, and the creation of rights in others to an interest in the deposit does involve an amendment of the original contract.

No published Tennessee authority is found which defines degree of mental incapacity required to invalidate a contract. *Mays v. Prewett*, 98 Tenn. 474, 40 S.W. 483 (1897) refers to an unconscionable contract by a person unable to guard against imposition. *Craddock v. Cabiness* 31 Tenn. (1 Swan.) 474 (1852) relates to a person of weak understanding superimposed by undue influence or deceitful misrepresentations. To the same effect are *Johnson v. Chadwell* 27 Tenn. (8 Humph.) 145 (1847) and *Moody v. Fry* 22 Tenn. (3 Humph.) 567 (1842). The facts of the present case do not conform to the facts of the cited cases.

In 17 C.J.S. Contracts § 133(1)(e), pp. 860, 861, 862, is found the following text:

The test of mental capacity to contract is whether the person in question possesses sufficient mind to understand, in a reasonable manner, the nature, extent, character, and effect of the act or transaction in which he is engaged; the law does not gauge contractual capacity by the standard of mental capacity possessed by reasonably prudent men. It is not necessary to show that a person was incompetent to transact any kind of business, but to invalidate his contract it is sufficient to show that he was mentally incompetent to deal with the particular contract in issue, ...

On the other hand, to avoid a contract it is insufficient to show merely that the person was of unsound mind or insane when it was made, but it must also be shown that this unsoundness or insanity

was of such a character that he had no reasonable perception or understanding of the nature or terms of the contract. The extent or degree of intellect generally is not in issue, but merely the mental capacity to know the nature and terms of the contract.

While the mental incapacity which will render one incapable of contracting need not be so great as entirely to dethrone the reason, and imbecility or weakness of mind to a degree destroying one's capacity to understand and protect his own interests will avoid his contract, there must, to invalidate the contract, be at the time thereof such impairment of reasoning powers as to make the person incapable of acting rationally in the transaction involved, or such mental unsoundness as occasions an inability to comprehend the subject of the contract and its nature and probable consequences, or as renders the individual incapable · of understanding and acting with discretion in the business at hand; and it has been held that to invalidate his contract there must be an entire loss of a person's understanding as respects such transaction.

In the final analysis, contractual capacity is a question to be resolved in the light of the facts of each case and the surrounding circumstances.

In *Seat v. McWhirter*, 93 Tenn. 542, 29 S.W. 220 (1894), there was a suit to cancel two deeds, made without consideration, on grounds of incapacity and fraud. The Trial Court cancelled the deeds, but the Supreme Court reversed and said:

> The law does not require that persons shall be able to dispose of their property "with judgment and discretion" in order to the validity (sic) of a conveyance. It is sufficient if they understand what they are about. *Paine v. Roberts*, 82 N.C. 451.

93 Tenn. at 569, 29 S.W. 220.

In 38 C.J.S.—Gifts, Sec. 13, pp. 789, is found the following text:

> ... As a general rule, any person of legal age, having the mental capacity to understand the nature of the transaction, may be the donor of property of which he is the legal or equitable owner....

> The general rule is that, if the donor has sufficient mental capacity to comprehend the transaction, if he understands the extent and value of his property, what persons are the objects of his bounty, and the manner in which he is distributing his property among them, his gift will be valid....

As to the facts of the mental capacity of the deceased, the material times are, January 26, 1990, the day deceased directed Dean Roberts to carry out the change; January 27, 1990, the day deceased signed the documents relating to two certificates of deposit and directed that a third certificate and account be changed; and January 29, 1990, the day on which deceased signed the document relating to the third certificate of deposit and account.

■ Plaintiffs rely upon the testimony of the physician of deceased as follows:

Q. Okay. Dr. Huston, do you have an opinion whether—you have reviewed those documents and the statements in those, do you have an opinion as to whether or not Mr. Roberts had the capacity to appreciate what he was doing and the—his assets and the consequences of his actions at that time?

. . . .

Q. (By Mr. White) Do you have an opinion as to his mental state at that time?

A. His mental state during this time was the worst that I had ever seen or was aware of it having been. Now even on the 29th when he was showing signs of improvement, and I didn't see him on the 27th and 28th, but on the 29th, although he was improved compared to what the notes had suggested that he had been, he was still far below what I had ever seen him or well below what I had ever seen him before.

Although he was alert and oriented to who he was and where he was, he was disoriented as to when it was and all current events and he could not make simple computations and he was—his

personality was more repressed and out of line with what he normally was.

I mean, he was—he was clearly at some level of encephalopathic impairment and was not functioning at his base line level which, as I said before, was already not normal. He was at his lowest level of intellectual function during this time period compared to other times I had seen him. And by the time he was ready to leave the hospital, he was back closer to his base line state, which, again, was not normal. I hope that answers your question.

Q. Well, do you have an opinion as to whether or not a person at that level, and particularly, Mr. Roberts, would be able to recognize the consequence of these?

A. Well, we are frequently asked in disability assessments to write down whether or not we think a person is competent to sign checks and handle their personal affairs.

I think clearly he was not competent to do that, that he would not be at a level of intellectual function that he could rationally perform calculations or size up a situation to make a rational decision about it, particularly if it involved anything that was complicated.

The same witness also testified as follows:

Q. All right. Now you indicated that he might not have been capable of certain calculations, complicated calculations, or perhaps simple calculations. Is there any indication during that hospitalization that he didn't know who his family members were or what their relation to him was?

A. To my knowledge that was not a problem.

. . . .

Q. Okay. Did you ever discuss with him about his property, whether his money or his land, or did you ever understand the extent of his assets?

A. I had no idea at all.

Q. Okay. Is there anything that you know of from seeing him particularly on this last hospitalization that would indicate that he was unaware of what his assets, his land, and money consisted of?

A. I never discussed it with him, so I don't know.

Q. Okay. So there is nothing to indicate that he did or didn't—

A. That's right.

Q. —know what his assets were?

A. Right.

Q. Okay. Now his signature—you have identified an exhibit with his—three pages with his signatures, and the one with January the 27th you say looks like his normal signature?

A. Uh-huh, as I compare it to something I have from previous times in my records it looks about like his normal signature.

During the testimony of the physician, he admitted that the nursing records reflected no mental impairment.

Debbie Roberts, wife of Dean Roberts, testified that she stayed in the hospital room of deceased overnight on January 26, 1990, and visited him thereafter in the hospital and that his mental process was normal.

Margaret Gail Roberts, a great niece of deceased testified that she visited with deceased in the hospital for 1½ hours on January 29, 1990, and that deceased appeared normal warning her to drive carefully because it was raining.

Dean Roberts, son of defendant Guy Roberts, testified that he took deceased on trips 3 or 4 times and was the only one who took him to the doctor; that he visited deceased about every day or every other day in the hospital, taking him changes of clothes; that he (Dean) called the ambulance to transport deceased to the hospital on January 26, 1990, and followed the ambulance to the hospital; that he spent the first night with deceased at the hospital; that he returned to the hospital the following night when deceased discussed preparing his income tax return and said he wanted Guy and Nellie's names put on the certificates of deposit; "for them to receive the certificates"; that he told his father, Guy, and Nellie and "they went to the banks and had it fixed up"; that he (Dean)

carried the papers to deceased at the hospital on Saturday; that deceased entered the hospital on Thursday; told him he wanted Guy and Nellie to have the certificates on Friday and signed the first papers on Saturday and said "there's one at Macon Bank and the checking account at Macon Bank" and told Dean to get the ones from Macon Bank; that Guy obtained the papers from Macon Bank and deceased signed them on Monday.

Asked whether deceased read the papers, Dean Roberts answered:

> He looked at them. I don't know whether he read them or not.

The witness also testified:

Q. Now, from your conversations with your Uncle Cancel and from your observations, what was the condition of his mind at that time?

A. Well, I never did see him when he wasn't, he was always alert every time I ever seen him.

Q. Okay, when he signed the papers from the Whitleyville Bank and the Hermitage Springs Bank was he alert?

A. Yes.

Q. And was he alert when he signed the papers from the Macon Bank and Trust Company?

A. Yes.

Q. So if I understand you, Cancel wanted you to get the papers fixed?

A. Right.

. . . .

Q. And you're saying that the weekend of January 26th, 27th and 28th and 29th was the same to you as it was a week before that or three or four days afterwards?

A. You talking about his mind?

Q. Yes, sir.

A. Yes.

Q. Now, did you notice anytime when he was picking up any of the documents or the pencils that he had a shaking in his hand?

A. I never noticed it.

Plaintiffs concede that the testimony of the physician about the mental impairment of deceased is contradicted by lay testimony, but insist that the testimony of the physician has greater weight.

It should be noted that the physician did not examine deceased for competency to execute the papers in question. His examination sought to determine slowness or impairment of mental function as a measure of the toxic effect of a nosebleed which had caused blood to enter the digestive system and overload the capacity of the liver to remove toxic matter from the blood which nourished the brain. His questions to the deceased included, "who is the president"; "count down from 100 by 7's". There was no effort to ascertain whether deceased was aware of the identity of his relatives or estate or other facts relating to the competency to execute the instruments in question.

■ Everyone is presumed to be sane until the contrary is made to appear by satisfactory proof, the burden of which must be borne by the party who avers insanity. *Tenn. Consol. Coal Co. v. Layne*, 26 Tenn.App. 635, 176 S.W.2d 369 (1944).

■ The Trial Judge upheld the validity of the instruments in question. His memorandum states:

> While both the medical and lay testimony indicates that Mr. Cancel Roberts was in severe declining health at the time he made the gifts in question, the Court finds and holds that the decedent had sufficient mental capacity to make the gifts at issue which were merely to a survivorship interest. The proof, when taken as a whole, indicates that he knew the nature and extent of his certificates and checking accounts, that he knew the relationship of the parties to him and what disposition he wanted to make of the same.

This finding comes to this Court supported by a presumption of correctness unless the evidence preponderates otherwise. T.R.A.P. Rule 13(d); *Adams v. Dean Roofing Company, Inc.*, Tenn.1986, 715 S.W.2d 341.

■ In a non-jury case, the findings of a Trial Judge as to weight and credibility are entitled to great weight. *W.F. Holt & Co. v. A & E Elec. Co., Inc.,* Tenn.App.1983, 665 S.W.2d 722.

■ Even when no opposing expert testimony is offered, the trier of facts is still bound to decide the issue upon its own fair judgment assisted by expert testimony. *Gibson v. Ferguson,* Tenn.1976, 562 S.W.2d 188.

Even though the finding of the Trial Court does not explicitly state that the deceased was fully competent to execute instruments of the character here involved, this Court finds upon de novo examination of the evidence that he was so competent.

■ Plaintiffs' second issue is as follows:

Did the Trial Court err in finding that there did not exist a confidential or fiduciary relationship between Guy Roberts and/or Nellie Birdwell and the deceased, and thus denying the plaintiffs' the presumption of invalidity that arises from a confidential relationship?

The Trial Court held:

There is no proof in this case showing that the free will of the donor was destroyed and the will of the donees substituted thereof and in the absence of a per se confidential relationship there is no presumption of invalidity. *Kelly v. Austin,* supra.

This finding is presumed correct unless the evidence preponderates otherwise. T.R.A.P. Rule 13(d).

Plaintiff relies upon *Richmond v. Christian,* Tenn.1977, 555 S.W.2d 105 wherein a mother instructed her son to have her land divided into three parcels, one for each of her children, and to have deeds prepared to the three children; the deeds were prepared and executed, but were not delivered; thereafter, the mother became bedridden and her son lived with and took care of her until her death; she was totally dependent upon the son for conduct of business and personal needs; during this period, the mother executed a new deed conveying all of her property to the son. It appears that confidential relationship was admitted, for the issue on appeal was whether competent independent advice was sufficient to overcome the presumption of undue influence.

The present case is distinguishable upon its facts. It is noted that plaintiffs do not rely upon any confidential relationship with the nephew, Dean Roberts, who was the one who dealt with deceased. The issue alleges confidential relationship with the defendants, the brother and sister to whom the conveyances were made. It is true that one of the defendants, Nellie Birdwell, lived with, and kept house for her brother, the deceased; but there is no evidence that the deceased relied upon her in any way in respect to his business affairs other than filling out checks for utility bills and assembling tax information. A situation invoking gratitude does not constitute confidential relationship unless it includes reliance, which is not shown. The evidence shows that deceased was fully competent to and did attend to his business affairs except when he was in the hospital, at which time he relied upon his nephew, Dean Roberts, to transport him and "do his errands". There is no evidence that Dean Roberts or anyone else advised, guided or acted for deceased in any matter involving a decision.

There is no evidence in the present case that deceased had expressed a previous intention to favor plaintiffs or had executed any previous instruments, as in *Richmond v. Christian,* Tenn.App.1977, 555 S.W.2d 105. Deceased had refused to make a will and had said "let them fight over it".

The fact that Guy Roberts transported deceased on local trips and, on one occasion arranged the renewal of a certificate of deposit for deceased is not sufficient to establish a confidential relationship.

Moreover, neither defendant procured the signature of deceased on the instruments. They did, at the request of the nephew of deceased procure the necessary instruments from the various banks, but it was the nephew, Dean, who received instructions from deceased, requested defendants to procure the instruments because he was working during booking hours, and

who carried the instruments to the hospital for the signatures of deceased.

The evidence does not show a "confidential relationship" with Dean Roberts or either defendant, or a "procurement" by either defendant.

■ Plaintiffs' third issue is:

Did the Trial Judge err in finding that the document Cancel Roberts transmitted to the Citizens Bank, Hermitage Springs Branch establish that he intended to create a right of survivorship?

The document in question states:

I Cancel Roberts of Route 2, Box 81, Red Boiling Springs, TN 37150 direct the Citizens Bank, Hermitage Springs Branch to place the names of my Brother and Sister being Guy Roberts and Nellie Birdwell to my Certificate of Deposit.

The certificate of deposit in the record contains the following language:

Depositors: Cancel Roberts or Guy Roberts or Nellie Birdwell

.    .    .    .    .

"You" means the depositor(s) named above.

.    .    .    .    .

You will own this certificate as joint tenants with rights of survivorship (and not as tenants in common). (You may change this ownership by written instructions.)

It is uncontroverted that the names "Guy Roberts or Nellie Birdwell" were added to the original certificate. It is therefore clear that the above quotations are from the original document issued to Cancel Roberts and subsequently altered at his written direction.

It must be presumed that deceased was familiar with the wording of a $100,000.00 instrument held by him.

In respect to documents evidencing bank accounts, including certificates of deposit, T.C.A. 45–2–703(e)(1) provides:

"A designation of 'joint tenants with right of survivorship' or substantially similar language, shall be conclusive evidence in any action or proceeding of the intentions of all named that title vests in the survivor;"

Plaintiffs insist that the defendants cannot rely upon the terms of the certificate because the instruction for change, signed by the deceased, did not specify that the new certificate contain the same terms (joint survivor) as the certificate which it replaced. This Court does not agree. The instruction, quoted above, requested that the names of defendant be placed on the same certificate which was issued to deceased. This included by reference the terms of the certificate.

■ Plaintiffs rely upon T.C.A. § 45–2–703(d)(1) which provides:

When opening a multiple-party deposit account, or amending an existing deposit account so as to create a multiple-party deposit account, each bank SHALL utilize account documents which enable the depositor to designate ownership interest therein in terms substantially similar to the following:

(A) Joint tenants with rights of survivorship;

(B) Additionally authorized signatory; and

(C) Such other deposit designation as may be acceptable to the bank.

The quoted statute directs banks to utilize a certain type of document when opening or amending a deposit account. The reference is obviously to the signature card which is ordinarily used by banks for accounts subject to withdrawals. The statute does not apply to certificates of deposit which require no signature card and provide no withdrawal until maturity. A certificate of deposit partakes of some of the characteristics of a note evidencing a loan. Even if it be held that the statute applies to certificates of deposit, this Court is unwilling to invalidate the unequivocal acts of the

deceased because the bank did not provide some instrument mentioned in the statute.

Plaintiffs cite *Clark v. Brown*, Tenn. App.1983, 656 S.W.2d 4. In that case, the depositor went to the bank and stated that he wanted to add the name of Jesse Brown to his bank account. Nothing was said about a survivorship account. The depositor and Jesse Brown signed a new signature card. There was a separate "depositor agreement" which stated:

> This agreement, entered into by and between or among the parties signing the signature card constitutes their agreement that the account(s) opened in the Bank in their names is to be held as a joint account with full right of survivorship, unless otherwise indicated by specific papers or notations hereon, ...

The depositor agreement was not displayed, read or mentioned at the time the new signature card was signed. There was no discussion of the nature of the interest of Brown in the account. On the reverse side of the signature card was a form for "joint account with right of survivorship", but it was not signed by the depositor or Mr. Brown. This Court affirmed a summary judgment denying survivorship rights.

The facts of the cited case are distinguishable from the facts of the present case.

The judgment of the Trial Court is affirmed. Costs of this appeal are taxed against the plaintiffs. The cause is remanded to the Trial Court for any necessary further proceedings.

Affirmed and remanded.

CANTRELL and KOCH, JJ., concur.