# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
September 5, 2001 Session

## REBECCA MCMURRY v. METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY

**Appeal from the Circuit Court for Davidson County**
**No. 99C-1572    Hamilton V. Gayden, Jr., Judge**

---

### No. M2000-02902-COA-R3-CV - Filed February 26, 2003

---

This appeal is brought by an employee of the Metropolitan Government of Nashville and Davidson County who slipped and fell while working and, as a result, injured her knee. The employee brought suit pursuant to the Tennessee Governmental Tort Liability Act to recover damages for her lost earning capacity, pain and suffering, and expenses. Prior to this suit, Metro paid the employee's medical expenses and compensated her for the work that she missed during her recovery. The trial judge awarded the employee $24,000, finding that Metro was at fault, but that the employee's injury was merely the exacerbation of a previous knee injury. The trial court also awarded the employee $2,858.30 in discretionary costs, but disallowed a $900 charge for the trial preparation fee of the employee's expert. The employee appeals the trial court's final order. We affirm the trial court in all respects.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S., and WILLIAM B. CAIN, J., joined.

Richard W. Mattson, Nashville, Tennessee, for the appellant, Rebecca McMurry.

John L. Kennedy, Rita Roberts-Turner, Nashville, Tennessee, for the appellee, Metropolitan Government of Nashville and Davidson County.

**OPINION**

Rebecca McMurry filed a complaint against the Metropolitan Government of Nashville and Davidson County ("Metro") and the Davidson County Sheriff's Office ("DCSO"),[1] in which she alleged a cause of action against Metro pursuant to the Tennessee Governmental Tort Liability Act ("GTLA"). Ms. McMurry claimed that she slipped on water while working at the Criminal Justice Center in Nashville on September 14, 1998, and that, as a result of this fall, she suffered a knee injury. Ms. McMurry prayed for $130,000, which included money for her past and future damages resulting from her injury including pain and suffering, lost earning capacity and money for psychological treatment. Ms. McMurry also sought $3,758.30 in discretionary costs.

A non-jury trial was held, after which the trial judge awarded Ms. McMurry $24,000 for her damages and $2,858.30 in discretionary costs. Ms. McMurry appeals that award to this court. For reasons stated herein, we affirm the trial court's decision.

## I. Facts

The Appellant, Ms. McMurry, was forty-five years old and employed by Metro at the time of the accident. Ms. McMurry was working at the Criminal Justice Center and did not know that the hallway floor beyond the security door had just been mopped. After Ms. McMurry came through the security door she slipped and fell on the wet floor. When Ms. McMurry fell she landed in a seated position with her left knee twisted under her. Ms. McMurry testified that she heard a pop as she fell and that her left knee became so swollen that her pant leg had to be cut off of her leg by the emergency technician. Ms. McMurry was transported by ambulance to the emergency room at Nashville Meharry Hospital or General Hospital.

Since the September 14, 1998, accident, Ms. McMurry testified that she has seen four different doctors and tried 20 kinds of pain medication in addition to enduring physical therapy. Ms. McMurry was not satisfied with the treatment that she received from the first two doctors that she saw. Therefore, she contacted the doctor who had performed surgery on her knee in 1988, Dr. Huber, and he referred her to Dr. McLaughlin. Dr. McLaughlin performed arthroscopic surgery on Ms. McMurry's knee and eventually determined she had reached her maximum medical improvement.

Ms. McMurry missed 130 days of work while recuperating from her injury and had to take six (6) days of leave without pay to attend doctor appointments. Ms. McMurry testified that she still suffers from pain and that she sleeps in an inflated leg brace. She also testified she cannot stoop, squat, climb or run up and down steps and that she has a hard time reaching or doing excessive walking.

---

[1] The Court subsequently dismissed DCSO as a defendant because it is not an entity capable of being sued. Metro was the only remaining defendant.

Prior to the fall at issue in this appeal, Ms. McMurry had injured her left knee in 1988. As a result of that injury she had extra-articular reconstructive surgery on her knee for a torn anterior cruciate ligament. The surgery was performed by Dr. Huber. After this surgery, Ms. McMurry underwent physical therapy to rehabilitate her knee. For about four months after this surgery, Ms. McMurry remained under her doctor's care. There was some reference to a 22% disability rating to her lower extremity and a 9% rating to her body as a whole resulting from this prior injury.[2]

When describing her prior injury, Ms. McMurry stated that after the surgery she suffered few limitations. Her doctor gave her a brace after the surgery, but did not set any limits for her. He told her to wear the brace on her left leg until she was comfortable with the strength of her knee. Ms. McMurry testified that after her first surgery she could ride a bike, but could not run. Ms. McMurry testified that she started working herself out of the brace between 1995 and 1996. Further, that the last time that she wore the knee brace before the September 14, 1998, accident was in February of 1996.

Ms. Joyce Jordan, a co-worker of Ms. McMurry's since 1995, said that prior to the 1998 accident Ms. McMurry had a limp and wore a brace. Ms. Jordan testified that she saw Ms. McMurry in the brace "all the time" and that she had never seen Ms. McMurry without her knee brace prior to the 1998 accident. Mr. James McIllwain testified that he also noticed that Ms. McMurry had a limp and that Ms. McMurry complained about her knee injury prior to the 1998 fall. Mr. Bauder testified that he had seen Ms. McMurry in a knee brace and that she had a slight limp prior to the 1998 fall.

Dr. McLaughlin testified that when she first visited him, Ms. McMurry's situation was that she had fallen, had been treated conservatively, but still reported pain. She was still wearing a knee immobilizer because of her sensation of instability and was taking medications for her knee. Upon his initial examination, Dr. McLaughlin determined that Ms. McMurry had atrophy or loss of muscle bulk, which was attributable to decreased use of the left leg. Wearing a knee brace for a long period of time, as Ms. McMurry had, would promote atrophy. She had no effusion or swelling in the knee at that point, but reported tenderness around the knee. An MRI performed September 29, 1998, showed:

> some mild amount of fluid in the joint and showed some thinning of the anterior cruciate ligament, which may be chronic or acute. It may be at least a partial injury at one time in her past. I feel that that finding was secondary to her 1988 injury. Also showed some strain in the medial collateral ligament, which I felt that that was likely a portion of her new injury, the strain in the medial collateral ligament which is something that I would have anticipated to improve with conservative treatment over a reasonable period of time. The fact that I saw her approximately six months

---

[2]Dr. Sieveking, Ms. McMurry's witness, testified that Dr. Huber's medical records reflected that Dr. Huber observed that Dr. Spangler had given Ms. McMurry the disability rating.

after her injury and she had not improved, raised the concern of, you know, why is she not improving.

Dr. McLauglin stated that, as when Dr. Huber had examined Ms. McMurry, there was a mild amount of laxity in the knee with regard to the anterior cruciate ligament. In summarizing the initial findings, Dr. McLaughlin testified:

> Well, the atrophy indicated an ongoing problem, that she had not been using the leg, to the extent that she had been using the opposite noninjured leg and had lost muscle tone. Everything else was subjective findings. When you touched - - you would have no other evidence of instability, with the exception of the atrophy and a mild amount of laxity, what we call a DeWar's test, which is indicative of some instability in the anterior cruciate ligament. Again, to clarify that, I think that was related to her 1988 injury.

After the first visit, Dr. McLaughlin wanted to try additional testing to determine the degree of laxity and any neurological defects. At that point, he determined to limit Ms McMurry's activities by recommending only sedentary work and considered aggressive physical therapy. Ms. McMurry subsequently had a Functional Capacity Evaluation, but Dr. McLaughlin felt it was unreliable because Ms. McMurry put forth no effort with her left leg. In subsequent visits to Dr. McLaughlin, Ms. McMurry was still complaining of pain. At one visit she related that she had experienced swelling in her knee and a high temperature and had gone to the emergency room for treatment where she had fluid removed from her knee. Dr. McLaughlin was never able to get the medical records from the hospital emergency room to explain that episode. She was referred by the emergency room doctor back to Dr. McLaughlin, who stated that on her next visit Ms. McMurry reported falling when her knee buckled while she was at the emergency room. She had a contusion over the front of her kneecap and a mild abrasion. X-rays did not show any new findings. Because he never got the records from her treatment at the emergency room, Dr. McLaughlin was unable to opine whether the condition triggering that visit was related to her 1998 fall and injury. He did opine, however, that the atrophy in her leg and subsequent weakness in the knee contributed to her fall in the emergency room.

Dr. McLaughlin put Ms. McMurry back in a knee immobilizer and followed up with a visit ten days later. He had still been unable to get medical records and lab results from the emergency room and was waiting for the results of her neurology consultation. He continued her on sedentary work restrictions.

The neurologic study of the leg was normal, so Dr. McLaughlin recommended arthroscopy of the knee to diagnose the problem. He testified:

> The arthroscopy of the knee showed mild inflammation of the knee, what appeared to be chronic, a continuing situation of the cruciate ligament. The joint surfaces of the kneecap showed some mild chondromalacia, which was shaved. There was also

a mild amount of change over the tibial plateau, which was not necessarily out of the range of normal for a 45-year-old individual. But the cartilages inside the knee looked intact, and the biggest finding was that she did have some scar tissue in her knee from her previous surgery, which was debrided or removed in order to aid in seeing, being able to visualize the structure of the knee joint.

Dr. McLaughlin testified that it was very difficult to state with certainty whether any of the conditions found during the arthroscopy were caused by the September 1998 fall. The changes in the back of the knee cap and chondromalacia, or softening of the cartilage, could occur as a result of, or be exacerbated by, a direct fall on the kneecap.

After the surgery, Ms. McMurry initially was improving and doing well with pain. The doctor wanted to get her back into physical therapy to resolve some of the atrophy. After some delay, she began that therapy. She became independent with stairs and was able to walk, and her strength was improving. However, two weeks into her therapy, she reported hitting a file cabinet which struck her in her left kneecap, and she had pain since that incident. Dr. McLaughlin altered the therapy, continued her anti-inflammatory medication, and continued her on light duty. When the doctor saw Ms. McMurry three weeks later, she was still having pain in the knee, and was having headaches. Her examination showed tenderness over the medial lateral joint line, and X-rays showed no further findings. At that point, Dr. McLaughlin injected the knee with a steroid solution to "settle down" any inflammatory change inside the knee. He recommended that she follow up with her medical doctor regarding her headaches.

At her last visit, Ms. McMurry reported continuing pain in her knee, and she had the persistent atrophy and tenderness about the knee, with no real swelling inside the knee joint. Dr. McLaughlin told Ms. McMurry that he had set her work restrictions based on objective findings, and if she continued to have pain even with the restricted activity, she would need to make a decision whether to continue her current work. He did not feel there was anything else, surgical or non-surgical, that could be done and that she was at her maximum medical improvement. He assigned her an impairment rating at that time.

He prepared the job restrictions based upon her job description. Essentially, she could sit for seven to eight hours, alternately sit and stand for eight hours, standing and walking four hours each. There was no restriction in grasping or manipulation of her hands. She was prohibited from running even short distances. She was restricted from squatting, and with only occasional climbing and bending. She had a lifting restriction of 20 to 25 pounds occasionally and 10 to 15 pounds frequently, and she was to have no inmate contact. Dr. McLaughlin testified, "And my understanding was within the scope of her job that would allow her to do her job as described to me. . . ."

Dr. McLaughlin gave Ms. Murray a 3% impairment rating to "the lower extremity," and when asked if the impairment rating was just for the 1998 injury, he testified it was "based on an

exacerbation of the chondromalacia on the back of her kneecap, which would be consistent with the injury as she has described it to me."

Ms. McMurry's counsel referred her to Dr. Nicholas Sieveking, a clinical psychologist, for a determination of any occupational or personal consequences of her 1998 on the job injury. As part of his assessment, Dr. Sieveking reviewed Ms. McMurry's medical and occupational records, had her tested by a psychological examiner, and interviewed her. Dr. Sieveking testified at trial that during his first interview with Ms. McMurry she was very angry. Dr. Sieveking stated that Ms. McMurry acted as if "I [Dr. Sieveking] was going to in some way offend her." Dr. Sieveking testified that he came to believe that Ms. McMurry "is depressed, and a lot of her anger leading with unpleasantness or even rudeness . . . is a cover for that." He also stated that "she can be a testy and a difficult person to get along with, but I also think that she is considerably depressed." Dr. Sieveking opined that Ms. McMurry's fear, anger and depression impaired her intellectual functioning. Dr. Sieveking testified that Ms. McMurry should have a trial of medication and, probably, some individual psychotherapy. The cost of this therapy would range from $5,000 to $7,000.

There was testimony about Ms. McMurry's difficult personality and somewhat conflicting testimony about when the anger or rudeness developed. Ms. Ginger Hall, Ms. McMurry's supervisor at the time of the accident, testified about Ms. McMurry's evaluations. The first was her evaluation from January of 1994 to January of 1995. In that evaluation she was given an above average rating but it stated "she is a very forward person, often being perceived by others as forceful or rude." Ms. McMurry's friend and co-worker Trudy Brown testified that Ms. McMurry was not snappy around her prior to the 1998 accident, but that other people had problems getting along with her. Ms. Brown stated that Ms. McMurry was more snappy since the accident as well as less interested in doing things with others. James Thomas McIllwain, a co-worker of Ms. McMurry, testified that he had known her since 1993 and that "when she first came up there [to work at the Criminal Justice Center] she had an attitude, and I told her. But since then she's mellowed out."

Dr. Sieveking calculated Ms. McMurry's occupational disability rating at 89%, taking all of Ms. McMurry's statements of what she could do and the pain she suffered as true. Using objective measures, i.e., medical evidence, primarily from Dr. McLaughlin, Ms. McMurry's disability rating would be 41% occupationally disabled. Ms. McMurry's current position at Metro falls within the percentage under either measure that she is able to perform. Many of the positions from which Ms. McMurry was disabled were positions in areas where she had not done any kind of work in the past.

## II. The Issues on Appeal

At conclusion of the trial, the trial judge held that "the legal cause of this accident was the failure to warn of a slippery surface in the building . . . and so [t]he Court does find that the fault was actually with the Metropolitan Government." Metro has not appealed the finding of liability.

The trial court also found, "[t]he big issue in this case is one of damages." On the issue of damages it said,

> [t]he Court finds . . . based upon Dr. McLaughlin's deposition that the damages are not anything like what the plaintiff asked for simply because the plaintiff had a preexisting condition that was only exacerbated by this accident. It was the exacerbation of a preexisting condition. She was suffering from atrophy, suffering from narrowing of the anterior cruciate ligament, as well as a defect with the medial collateral ligament. And arthroscopic surgery was done as a result of this accident. There was very little to do or be done, as her knee was in bad shape to begin with.

Further, the court found that there was not "any legal cause between the psychological problems that [Ms. McMurry] has and this accident." The court awarded Ms. McMurry $24,000 in damages. Ms. McMurry brings this appeal seeking to increase the damages the trial court awarded her and asserts that the trial court's award of damages is not reasonable in light of the evidence.

After trial, Ms. McMurry sought an award of discretionary costs totaling $3,758.30. The trial court awarded her $2,858.30, disallowing an expert's trial preparation charge of $900. On appeal, Ms. McMurry asserts that the trial court erred by not including $900 in the discretionary costs award for Ms. McMurry's psychologist's trial preparation charge.

Pursuant to the Tennessee Rules of Appellate Procedure, our review of this record is *de novo* upon the record of the trial court, accompanied by a presumption of correctness of factual findings, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Cross v. City of Memphis*, 20 S.W.3d 642, 643 (Tenn. 2000). In a nonjury case, the weight, faith and credit to be given to a witness' testimony lies in the first instance with the trial judge who has the opportunity to observe the manner and demeanor of the witnesses as they testify. *Roberts v. Roberts*, 827 S.W.2d 788, 795 (Tenn. Ct. App. 1991); *Weaver v. Nelms*, 750 S.W.2d 158, 160 (Tenn. Ct. App. 1987). Because the trial judge is in a better position to weigh and evaluate the credibility of the witnesses who testify orally, we give great weight to the trial judge's findings on issues involving credibility of witnesses. *Randolph v. Randolph*, 937 S.W.2d 815, 818 (Tenn. 1996); *Town of Alamo v. Forcum-James Co.*, 205 Tenn. 478, 327 S.W.2d 47 (1959); *see Sisk v. Valley Forge Ins. Co.*, 640 S.W.2d 844 (Tenn. Ct. App. 1982).

### III. Sufficiency of Damages

The first issue is whether the trial court erred by setting the total amount of damages sustained by Ms. McMurry at $24,000. In addition to the medical expenses and injury-on-duty benefits already paid by Metro,[3] Ms. McMurry claimed out-of pocket medical expenses of $2,562

---

[3]In addition to the $24,000 damage award, Metro has already paid Ms. McMurry's medical bills, which totaled $16,023.07, and paid Ms. McMurry compensation from her injury-on-duty benefits for 130 days of work missed, which
(continued...)

and $763.03 in lost wages and also sought damages for the cost of future psychological therapy ($5,000 - $7,000), lost earning capacity, past and future pain and suffering, and past and future loss of enjoyment of life.

The trial court's award of $24,000 reflects the trial court's factual findings that: (1) the 1998 accident resulted only in an aggravation of Ms. McMurry's pre-existing condition; and (2) no causation was shown between the 1998 accident and her depression. On appeal, Ms. McMurry argues that these erroneous findings resulted in an abnormally low award of damages.

## A. Pre-Existing Injury

A tortfeasor is liable for all injuries proximately caused to a plaintiff. When the plaintiff has a pre-existing medical condition, "[t]he defendant is responsible for all ill effects which naturally and necessarily follow the injury in the condition of health in which the plaintiff was at the time of the [injury]." *Elrod v. Town of Franklin*, 140 Tenn. 228, 240, 204 S.W.2d 298, 301 (1917). Thus, it has long been the law that a tortfeasor "must accept the injured person as he finds him," in that the tortfeasor is liable for the injury or harm actually caused by or which is the natural consequence of the tortfeasor's negligence whether the plaintiff was "weak or strong, healthy or sick" before the accident. *Id.*

However, a party whose negligence causes injury to another is liable only for those damages actually and proximately caused thereby. *Haws v. Bullock*, 592 S.W.2d 588 (Tenn. Ct. App. 1979). A defendant is not liable for damages from an earlier condition or injury, not having caused those damages, except to the extent of aggravation or enhancement by the defendant's acts. *Id.* Where possible, the factfinder must apportion the amount of disability and pain between that caused by the pre-existing condition and that caused by the accident. *Id.* 592 S.W.2d at 591. A plaintiff can recover for an increase in disability resulting from an accident, but not for her total disability resulting from the pre-existing condition plus the aggravation caused by the accident. *Kincaid v. Lyerla*, 680 S.W.2d 471, 473 (Tenn. Ct. App. 1974).

In other words, while a plaintiff is entitled to recover for all injures proximately caused by the acts of a tortfeasor, when a plaintiff's "injuries are aggravated or activated by a pre-existing physical or mental condition, [the] defendant is liable only to the extent that his wrongful act proximately and naturally aggravated or activated plaintiff's condition." *Haws*, 592 S.W.2d at 591; *Kincaid*, 680 S.W.2d at 473.

The trial court herein found that Ms. McMurry had a pre-existing condition which was only exacerbated by the accident herein. The evidence does not preponderate against that finding. Dr. McLaughlin gave Ms. McMurry a permanent disability rating of three percent (3%) to her lower

---

[3](...continued)
totaled $13,499.43. These amounts would normally be included in a damage award amount making the total damages paid by Metro $53,522.50.

extremity because of "exacerbation" of the condition in her kneecap. He attributed the laxity to the 1988 injury as well as the thinning of the anterior cruciate ligament. Although the strain in the medial collateral ligament, disclosed by the MRI, was likely attributable to the 1998 fall, that condition should have improved with conservative treatment over a reasonable period of time. The mild inflamation was chronic based on the cruciate ligament. The scar tissue was from her 1988 surgery. The only condition which Dr. McLaughlin could attribute even partially to the 1998 injury was the mild chondromalacia, which he determined was exacerbated by the later fall. He shaved that area of the kneecap during surgery.

Ms. McMurry's testimony regarding her recovery from the 1988 surgery was contradicted in part by the testimony of several witnesses that Ms. McMurry "always had a slight limp" and that she still wore a knee brace in 1998. The trial court was entitled to resolve issues of credibility, and the findings of the trial court which depend on the credibility of witnesses who testified live are to be afforded great deference. *Clarendon v. Baptist Mem. Hosp.*, 796 S.W.2d 685, 689 (Tenn. 1990) (citing *Humphrey v. David Witherspoon Inc.*, 734 S.W.2d 315 (Tenn. 1987)).

With respect to the deposition testimony of a doctor, this court may draw its own conclusions, but may not evaluate the deposition testimony of such experts in a vacuum. We must consider the expert testimony along with the testimony of lay witnesses in order to evaluate the effects of the injury on the plaintiff. *See Thomas v. Aetna Life and Cas. Co.*, 812 S.W.2d 278, 283 (Tenn. 1991). Whether a medical opinion is accepted or rejected is often dependent upon whether lay witness testimony is accepted or rejected. The trial court is simply in a better position than the appellate court to judge the credibility of such oral testimony. *See Harwell v. Harwell*, 612 S.W.2d 182 (Tenn. Ct. App. 1980). In the case before us, the expert testimony was not inconsistent with those lay witnesses who testified that Ms. McMurry continued to experience problems resulting from the 1988 injury and reconstructive surgery to her anterior cruciate ligament.

Based upon our review of the entire record, we conclude that the evidence does not preponderate against the trial court's finding that the 1998 slip and fall resulted in an exacerbation of a pre-existing injury. Thus, having paid medical expenses and lost wages attributable to the fall, Metro is liable only for an increase in disability resulting from the exacerbation and for pain and suffering caused by the exacerbation.

## B. Psychological Damages

Ms. McMurry also argues that she is entitled to an increase in the damages awarded to her by the trial court by $5,000 to $7,000 for psychotherapy. At trial, Ms. McMurry offered the testimony of her psychologist Dr. Sieveking who recommended the psychotherapy. Metro did not offer any evidence to contradict this testimony, Ms. McMurry contends that and therefore, the trial court is bound to accept the opinion of the expert witness because the weight of the evidence is in Ms. McMurry's favor.

The trial judge found that there was no legal cause "between the psychological problems that [Ms. McMurry] has and this accident," therefore, did not include any of this amount in the damages award, but did give some weight "to the difference in the industrial disability before this accident." As discussed earlier, a tortfeasor may be held liable only for those injuries or damages actually caused by his or her negligence. Thus, to recover for personal injuries under a negligence theory, a plaintiff must prove, among other elements, that the defendant's negligence was the cause in fact of the injuries claimed. *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995) (citations omitted). "Causation in fact refers to the cause and effect relationship that must be established between the defendant's conduct and the plaintiff's loss before liability for that particular loss will be imposed." *Waste Mgmt, Inc. v. South Cent. Bell Tel. Co.*, 15 S.W.3d 425, 430 (Tenn. Ct. App. 1997) (citations omitted).

Whether the defendant's negligence actually caused the particular injury complained of is generally a question of fact to be determined by the factfinder. A trial court is not bound to accept the opinion of an expert witness as to cause and effect. *Armstrong v. Hickman County Hwy. Dep't*, 743 S.W.2d 189, 194-95 (Tenn. Ct. App. 1987) (citing *Gibson v. Ferguson*, 562 S.W.2d 188, 189 (Tenn. 1976); *Miller v. Alman Constr. Co.*, 666 S.W.2d 466 (Tenn. Ct. App. 1983); *Reserve Life Ins. Co. v. Whittemore*, 59 Tenn. App. 495, 442 S.W.2d 266 (1969); *State ex rel. Moulton v. Blake*, 49 Tenn. App. 624, 357 S.W.2d 836 (1962)). Even when no opposing expert testimony is offered, the trier of fact is still bound to decide the issue upon its own fair judgment assisted by expert testimony. *Roberts*, 827 S.W.2d at 795; *see Gibson*, 562 S.W.2d at 189-90. Therefore, the opinions of an expert witness are advisory, not conclusive.

As with other expert opinion, the trial court may view the opinion in conjunction with lay testimony. Dr. Sieveking, Ms. McMurry's expert witness in this case, testified that Ms. McMurry was depressed and that her rude and angry nature were a "cover" for her depression. There was testimony indicating that these personality traits preceded the 1998 fall. Thus, to the extent the depression was evidenced by a difficulty in dealing with others, there was testimony this difficulty, and any depression it evidenced, preceded the 1998 fall. The trial court weighed the conflicting evidence and determined that no connection was proved between this accident and any psychological problems.

The evidence does not preponderate against the trial court's finding that Ms. McMurry's depression was not caused by the 1998 fall and resulting exacerbation of her prior injury.

C. Sufficiency of Damage Award

The plaintiff carries the burden at trial to prove, by a preponderance of the evidence, the amount of her damages. *Walker v. Sidney Galreath & Assoc.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000). The proof of damages need not be exact or mathematically precise. *Airline Constr., Inc. v. Barr*, 807 S.W.2d 247, 273-74 (Tenn. Ct. App. 1990). Rather, the plaintiff must prove damages with a reasonable degree of certainty which enables the trier of fact to make a reasonable assessment of the damages. *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 703 (Tenn. Ct. App. 1999). The trier of

fact may not base an award of damages on "mere conjecture or speculation." *Western Sizzlin, Inc. v. Harris*, 741 S.W.2d 334, 335 (Tenn. Ct. App. 1987) (quoting *Wilson v. Farmers Chem. Assoc.*, 60 Tenn. App. 102, 444 S.W.2d 185 (1909)).

Damages in personal injury actions "are not measured by fixed rules of law, but rest largely in the discretion of the trier of fact and [are] entitled to great weight in the appellate courts in the absence of a showing of fraud or corruption." *Coakley v. Daniels*, 840 S.W.2d 367, 372 (Tenn. Ct. App. 1992) (citing *Blalock v. Temple*, 38 Tenn. App. 463, 276 S.W.2d 493, 494 (1954)). The appellate court will not reverse the trial court unless there is a finding that the award of damages shows prejudice or is so grossly inadequate as to shock the conscience of the court. *See Karas v. Thorne*, 531 S.W.2d 315, 317 (Tenn. Ct. App. 1975).

Dr. Sieveking gave Ms. McMurry a 41% occupational disability rating, but only a 6% disability rating from administrative or clerical positions. Further, neither of Dr. Sieveking's ratings account for any residual pre-existing disability that Ms. McMurry may have had from her 1988 injury.

In the case herein, the trial court found that Ms. McMurry established that her damages were $24,000. In fashioning the award for damages, the trial court stated:

> The Court therefore does give damages for the medical bills she's spent, for pain and suffering, but the Court also allocates much of that to the fact that she already had a bad condition. And under the law, the defendant is liable only for those things that were increased as a result of this accident and not the condition that was there before.

Based on our concurrence with the trial court's findings regarding the cause of some damage, we do not find that the trial judge's award of damages in this amount is so grossly inadequate that it shocks the conscience of this court.

## IV. Discretionary Costs

The last issue before this court is whether the trial court erred by awarding Ms. McMurry $2,858.30 in discretionary costs, not the $3,758.30 that she requested, disallowing $900 for the trial preparation fee of Dr. Sieveking. Ms. McMurry argues that the court abused its discretion by not awarding her $900 in discretionary costs for Dr. Sieveking's expert testimony because his testimony was necessary and "an expert witness cannot testify accurately without sufficient pre-trial preparation, which in this case included the conference with Ms. McMurry's attorney and time for . . . [him] to review . . . his file." Therefore, Ms. McMurry asks this court to increase her award by $900 for this charge.

The Tennessee Rules of Civil Procedure authorize the trial court to award discretionary costs for other expenses related to the preparation and trial of a case. Tenn. R. Civ. P. 54.04(2). Specifically, the Rule states:

> Costs not included in the bill of costs prepared by the clerk are allowable only in the court's discretion. Discretionary costs allowable are reasonable and necessary court reporter expenses for depositions or trials, reasonable and *necessary* expert witness fees for depositions or trials . . . .

Tenn. R. Civ. P. 54.04(2) (emphasis added). The awarding of costs under the rule is a discretionary matter with the court. *Lock v. National Union Fire Ins. Co.*, 809 S.W.2d 483, 490 (Tenn. 1991). Absent a clear abuse of discretion, appellate courts generally will not interfere with a trial court's assessment of costs. *Perdue v. Green Branch Mining Co., Inc.*, 837 S.W.2d 56, 60 (Tenn. 1992); *Stalsworth v. Grummons*, 36 S.W.3d 832, 835 (Tenn. Ct. App. 2000)

Tenn. R. Civ. P. 54.04 specifically limits discretionary costs with regard to expert witnesses to their fees for testifying. *Miles v. Marshall C. Voss Health Care Ctr.*, 896 S.W.2d 773, 776 (Tenn. 1995). Expert fees are limited to fees incurred for actual deposition or trial testimony. *Shahrdar v. Global Hous., Inc.*, 983 S.W.2d 230, 239 (Tenn. Ct. App. 1998). Fees for preparation time are not recoverable. *Id.*; *Miles*, 896 S.W.2d at 776. Similarly, the portion of the fee charged for evaluating the employee is not recoverable under Rule 54.04(2). *Miles*, 896 S.W.2d at 776.

Ms. McMurry does not claim the $900 was for anything other than preparation. However she cites *Stalsworth v. Grummons*, 36 S.W.3d 832 (Tenn. Ct. App. 2000), as suggesting that trial preparation expenses are recoverable. This court in *Stalsworth* "declin[ed] to find that under no circumstances would a nontestifying expert's fees be reasonable and necessary." *Id.* at 835. The court went on further to grant fees to nontestifying experts in that case. *Id.* The decision in *Stalsworth* is distinguishable from this case because the fees in *Stalsworth* were for the expert's time being available to testify where the plaintiff nonsuited at the beginning of trial. The fees in question were not for trial preparation, such as in the present case. *Id.* at 836.

Based upon well-settled principles, the trial court correctly awarded the fees that Ms. McMurry requested for actual testimony, but disallowed the trial preparation fee. Dr. Sieveking's trial preparation fee is not one that is recoverable under Tenn. R. Civ. P. 54.04(2), and we affirm the decision of the trial court.

## V. Judgment

The judgment of the trial court is affirmed. Remand this cause to Circuit Court of Davidson County for further proceedings consistent with this opinion. Tax the costs on appeal to the appellant, Rebecca McMurry.

_____
PATRICIA J. COTTRELL, JUDGE