IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 3, 2025

## ROBERT MICHAEL SWAFFORD v. CATHERINE LYDIA TRAIL SWAFFORD

**Appeal from the General Sessions Court for Rhea County**
**No. 19-CV-158      Jace Cochran, Judge**

———————————————————

**No. E2024-01663-COA-R3-CV**

———————————————————

Husband and Wife divorced. In dividing the marital estate, the trial court determined that an account inherited by Wife had been transmuted into marital property and that Wife had dissipated a substantial portion of the transmuted account. Considered as a whole, the trial court allocated the marital estate in a manner that Wife asserted was inequitable. She repeatedly requested findings by the trial court explicating its division of marital estate. The trial court declined to provide such findings. On appeal, Wife challenges the trial court's classification of the aforementioned account and its conclusion that she dissipated the account. Wife also challenges the trial court's overall division of marital property both as being inequitable and for the insufficiency of the trial court's findings. We affirm the trial court's ruling as to transmutation. We vacate the trial court's ruling as to dissipation and the trial court's division of property, and we remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the General Sessions Court Affirmed in Part; Vacated in Part; and Remanded**

JEFFREY USMAN, J., delivered the opinion of the court, in which D. MICHAEL SWINEY and VALERIE L. SMITH, JJ., joined.

Cecelia S. Petersen, Knoxville, Tennessee, for the appellant, Catherine Lydia Trail Swafford.

Howard L. Upchurch and Stacy H. Farmer, Pikeville, Tennessee, for the appellee, Robert Michael Swafford.

**OPINION**

I.

After approximately 28 years of marriage, Robert Swafford (Husband) filed for divorce from Catherine Swafford (Wife), who responded with a countercomplaint. The ensuing proceedings were lengthy, lasting over five years before completion of the divorce trial. Because the parties stipulated to a divorce without a finding of fault, and because they had no minor children, Husband's and Wife's proof at trial focused primarily on the classification and division of marital property.[1]

Husband and Wife agreed that Husband had been the primary wage-earner throughout the marriage. Husband testified that he had worked for the postal service from prior to the marriage through his retirement during the divorce proceedings. After retirement, Husband received gross monthly social security benefits in the amount of $2,776.70 and gross monthly retirement pay in the amount of $2,882. Based on Husband's years of service prior to the marriage, Wife determined that 93.89% of Husband's retirement pay was marital property, and she requested half that amount. Husband agreed. Husband also received a gross payout of $23,813.30 for his remaining unused annual leave at retirement. Wife testified that Husband had received nine months of retirement pay by the final day of trial, but that she had received none of those funds. Wife also indicated that she had not received any payout related to Husband's annual leave accumulated during the marriage.

Wife, not yet retired, explained that she was a licensed practical nurse and phlebotomist who worked outside the home "off and on." Her licensing had lapsed during a period when she stayed at home to raise children, but she had renewed it "maybe ten years back" and worked during the marriage from that time onward. Wife indicated that she often worked part time so that she could help care for her grandchildren. After the parties' separation, however, Wife stopped working for approximately two years. She testified that she "had some health issues," including "depression and anxiety," that prevented her from having a job during that time. She later took another extended break from employment after breaking her arm. At the time of trial, she was working again, earning approximately $45,000 annually.

Since the first few months of the divorce proceedings, Husband had been under a court order to pay the following of Wife's bills: "mortgage on the marital home [of which Wife was awarded sole possession], water, electric, cell phone, automobile insurance, house insurance on the marital home, Dish, Wi-Fi, yard maintenance, exterminator and the minimum payment on the Lowe's credit card." Around three years into the proceedings, Husband and Wife agreed to sell the marital home and split the $110,000 net proceeds equally between themselves. Because several bills Husband had been ordered to pay no longer existed, Wife sought a court order that Husband provide her more money. The court

---

[1] At the beginning of trial, Wife's request for alimony was also at issue. However, Wife concedes on appeal that she "abandoned her claim for alimony after Husband retired during the pendency of the case, leaving her working and Husband not."

denied Wife's request. She complained at trial that she had "had to pay rent for the past two years."

Husband and Wife agreed that Husband was mostly in compliance with the court's order. Wife complained that Husband had once failed to pay her electricity bill, causing her electricity to be cut off and requiring her to have to pay it herself to reconnect it. She also complained that she had one outstanding medical bill that Husband was "not paying on, [and] it's at collections." Additionally, she alleged that she had to "pay [her] own phone bill" by the time of trial because Husband had "cut [her] off of his phone plan." She had been purchasing additional health insurance for "maybe a little over half a year" despite remaining covered by Husband's health insurance. According to Husband, after retirement, he was making required payments and financially "breaking even." He was living with his girlfriend and her son, and he paid them $400 in rent plus groceries each month.

Husband and Wife mainly disputed the proper classification and division of their largest two assets: Husband's Thrift Savings Plan with the postal service, and a Fidelity investment account in Wife's name. The parties agreed that the $255.72 balance of the Thrift Savings Plan prior to the marriage was Husband's separate property. However, by the final day of trial, the account was valued at $512,221.01. Husband contended that, of that amount, only the value of the account at the date of the parties' separation should be considered marital property to be divided between them, and the rest should be his separate property. He claimed that marital amount was "approximately $280,000."[2]

Husband argued that, if the court adopted his requested classification of property, the marital portion of the Thrift Savings Plan would have approximately the same value as the Fidelity account at the time of the parties' separation. Therefore, because he contended that the Fidelity account was all marital property, he argued that it would be equitable for him to keep the Thrift Savings Plan account while Wife kept the Fidelity account. Wife disagreed. In her view, the Fidelity account was her separate property, and the entirety of the Thrift Savings Plan, aside from the undisputed $255.72, was marital property.

Wife had created the Fidelity account and funded it with $279,667.07 from a joint account just a few days after the parties' separation. Even though these funds had been in a joint account with rights of survivorship for years, Wife argued that they were always her separate property because they derived from a Raymond James account that had been bequeathed to Wife by her mother. Wife's mother had also bequeathed to her an IRA valued at $45,114.72. Wife never transferred the IRA funds to any other account or added Husband's name to the IRA, and the parties do not dispute that the IRA has always remained Wife's separate property.

---

[2] A report made approximately four months after the parties' separation valued the account at $266,223.20. No reports dated closer to the parties' separation appear in the record.

Husband argued that the transfer of funds from the Raymond James account into the joint account transmuted them into marital property. He testified that Wife had told him that establishing the joint account "was the thing to do" at that time. Wife acknowledged that Husband had as much access to the joint account as she, but she contended it was significant that Husband did not ever actually withdraw money from the joint account. She testified that she had put the funds in the joint account "for estate planning purposes only," and she pointed to prior cases in which courts had concluded that similar testimony supported findings that the joint accounts in those cases had not been transmuted. Though Wife asserted that the reason for the creation of the joint account had been for estate planning purposes, when questioned about the account's "with rights of survivorship" designation, she stated that she did not "know what the WROS [designation], rights of death and stuff" meant.

Wife explained that she transferred the funds from the joint account into the Fidelity account in her sole name because Husband "told [her] he was leaving." Husband provided documentation that she had withdrawn $182,228 from the Fidelity account since that time. Wife was unable to provide an explanation for where the majority of that money had gone. She estimated it went toward "living expenses," including "moving expenses." She had "probably paid off credit card bills" with it. She also "had birthdays, Christmases, holidays for all [her] family," and she had taken trips to visit her uncle, her sister, and her brother-in-law. Additionally, she had "bought a car, which was $30,000," after discovering that her old vehicle "was starting to need repairs." She added that she had "paid [her] lawyer $24,000 up to [trial]." After all of the withdrawals, the most recent Fidelity statement valued the account at $88,829.74. Wife did not know exactly what the account was worth on the day of trial, testifying that, "well, it's [affected by] market drive, . . . so one day it's one thing, and one day it's another thing."

The court ruled that both the Thrift Savings Plan and the Fidelity account were marital property. The trial court also found that Wife had dissipated $182,228 of marital property through her unauthorized and improperly explained withdrawals from the Fidelity account.

The court subsequently issued a final decree in which it valued and divided these two properties as follows:

> [Because Wife's withdrawal of] $182,228.00 amounts to dissipation of a marital asset[, t]he court, therefore, finds that the value of $280,000.00 should be assigned to this Fidelity Investment [account] as a marital asset, and that this marital asset should be divided equally between the parties, $140,000.00 to [Husband] and $140,000.00 to [Wife] . . . .

> . . . [The] Thrift Savings Plan . . . has a current value of $512,000.00. Considering a number of factors including the value of this Thrift Savings Plan on or near the day and date of the parties' separation in May of 2019 ($219,000.00), the growth of this account for the five (5) year period from and after the date of the parties' separation and during the period of time that the parties[] lived separate and apart,[3] and other factors, and equitable distribution of the Thrift Savings Plan shall be to award [Husband] $372,000.00 of this Thrift Savings Plan and [Wife] $140,000.00 of this Thrift Savings Plan . . . .

The court attached to the final decree a transcript of its oral ruling, in which it explained its reasoning as follows:

> The valuation of the [Thrift Savings Plan] account is $512,000.00. But simply the valuation itself does not dictate who receives what of it. I find that an equitable division of that valuation is as follows: approximately $140,000.00 to [Wife], and approximately $372,000.00 to [Husband]. And I make that division with the following in mind:
>
> . . .
>
> So when [Wife] separated, she moved [the funds in the joint account] into an account solely in her name with her as the only owner, and the approximate valuation of the account – and I say approximate because it's going to save, simplicity – was $280,000.00 at the time that she moved the account . . . . And so the division of that asset should have been, or should be, I say currently, should be $140,000 to Husband, [and] $140,000 to Wife.
>
> Now, because I divided the Thrift Savings Account with a $140,000 awarded to [Wife], that amounts to no money changing hands, either from Fidelity or from the Thrift Savings Account. It is essentially a wash.
>
> . . .
>
> I realize that's not a fifty/fifty division. But I believe it's an equitable and fair division considering [Wife's] conduct in absconding and dissipating the Fidelity account.

---

[3] In its earlier oral ruling, which the trial court attached to its written ruling, the trial court stated that the valuation of the Thrift Savings Plan should be "taken at today's date since we are granting this divorce today."

Because the amounts awarded to Husband from the Fidelity Account and to Wife from the Thrift Savings Account were equal, the court ordered that neither party would be required to pay the other. Husband would retain the Thrift Savings Plan account valued at $512,221.01, and Wife would retain the Fidelity account valued at $88,829.74. The court listed the division of the remaining property in the final order. Husband would receive his proceeds from the home sale, his interest in a hunting club and his related equipment, his truck, and his checking account. Wife would receive her proceeds from the home sale, her automobile, proceeds associated with the sale of other vehicles, her checking account, and her IRA. The court divided the parties' debts by assigning to Husband the debt on his truck and two credit cards, while it assigned Wife the debt on another credit card.

Wife moved to alter or amend the final decree of divorce. *See* Tenn. R. Civ. P. 59.04 (permitting a motion to alter or amend a judgment to be filed within 30 days of entry of the judgment). Therein, she noted that at trial her counsel had requested at the final hearing that the court "make findings and conclusions supporting its disproportionate division of the marital estate." Specifically, Wife's counsel had moved at the end of trial for "a full, complete rule [52.01] findings and recommendations by the court." *See* Tenn. R. Civ. P. 52.01 (stating that "[i]n all actions tried upon the facts without a jury, the court shall find the facts specially and shall state separately its conclusions of law and direct the entry of the appropriate judgment"). The court had responded, "Your request is denied." Wife asked the court to amend its ruling regarding the distribution of property in several regards "or to at least set forth the facts and factors it finds justify the disproportionate distribution awarded." The court denied this motion.[4]

Wife appeals. She raises four objections to the trial court's classification and division of marital property. One, she argues the court erred in classifying the Fidelity account as marital property. Two, she asserts that the trial court erred in concluding that she dissipated the marital estate by spending from the Fidelity account. Three, she contends that the trial court erred in disproportionately dividing the marital estate. Four, Wife insists that the trial court's order does not include findings of fact and conclusions of law sufficient to meet the requirements of Tennessee Rule of Civil Procedure 52.01.

II.

The Tennessee Supreme Court has explained the standard of review for cases involving the classification and division of property in a divorce as follows:

> This Court gives great weight to the decisions of the trial court in dividing marital assets and "we are disinclined to disturb the trial court's decision unless the distribution lacks proper evidentiary support or results in some

---

[4] The court made one modification, which is not an issue in this appeal, regarding the parties' Qualified Domestics Relations Order for the division of Husband's retirement pay.

error of law or misapplication of statutory requirements and procedures." *Herrera v. Herrera,* 944 S.W.2d 379, 389 (Tenn. Ct. App. 1996). As such, when dealing with the trial court's findings of fact, we review the record de novo with a presumption of correctness, and we must honor those findings unless there is evidence which preponderates to the contrary. Tenn. R. App. P. 13(d); *Union Carbide Corp. v. Huddleston,* 854 S.W.2d 87, 91 (Tenn. 1993). Because trial courts are in a far better position than this Court to observe the demeanor of the witnesses, the weight, faith, and credit to be given witnesses' testimony lies in the first instance with the trial court. *Roberts v. Roberts,* 827 S.W.2d 788, 795 (Tenn. Ct. App. 1991). Consequently, where issues of credibility and weight of testimony are involved, this Court will accord considerable deference to the trial court's factual findings. *In re M.L.P.,* 228 S.W.3d 139, 143 (Tenn. Ct. App. 2007) (citing *Seals v. England/Corsair Upholstery Mfg. Co.,* 984 S.W.2d 912, 915 (Tenn. 1999)). The trial court's conclusions of law, however, are accorded no presumption of correctness. *Langschmidt v. Langschmidt,* 81 S.W.3d 741, 744-45 (Tenn. 2002).

*Keyt v. Keyt*, 244 S.W.3d 321, 327 (Tenn. 2007).

### III.

We turn first to Wife's contention that the trial court erred in classifying the Fidelity account as marital property. As a "dual property" state, Tennessee distinguishes between "separate property" and "marital property," and only marital property is subject to division in a divorce. *Snodgrass v. Snodgrass*, 295 S.W.3d 240, 246 (Tenn. 2009); Tenn. Code Ann. § 36-4-121. "'Separate property' is not part of the marital estate and is therefore not subject to division." *Id.* The Tennessee Supreme Court has indicated that it is "imperative that the parties, the trial court, or both identify all of the assets possessed by the divorcing parties as either marital or separate so that a proper division can be accomplished." *Id.* This classification is a question of fact "to be determined in light of all relevant circumstances." *Id.* at 245.

Marital property generally includes "all real and personal property, both tangible and intangible, acquired by either or both spouses during the course of the marriage up to the date of the final divorce hearing and owned by either or both spouses as of the date of filing of a complaint for divorce." Tenn. Code Ann. § 36-4-121(b)(2)(A). However, the legislature has by statute carved out from this definition any "[p]roperty acquired by a spouse at any time by gift, bequest, devise or descent" as that spouse's separate property. Tenn. Code Ann. § 36-4-121(b)(4)(D).

One spouse's separate property, including a separate inheritance, however, may become marital property through transmutation. *Langschmidt*, 81 S.W.3d at 747.

Transmutation occurs "when separate property is treated in such a way as to give evidence of an intention that it become marital property." *Langschmidt*, 81 S.W.3d at 747 (citing 2 Homer H. Clark, *The Law of Domestic Relations in the United States* § 16.2 at 185 (2d ed. 1987)); *see also, e.g.*, *Snodgrass*, 295 S.W.3d at 256 (quoting *Langschmidt*, 81 S.W.3d at 747); *Hill v. Hill*, 682 S.W.3d 184, 196 (Tenn. Ct. App. 2023) (quoting *Snodgrass*, 295 S.W.3d at 256). The Tennessee Supreme Court has further explained that

> [t]he rationale underlying these doctrines is that dealing with property in these ways creates a rebuttable presumption of a gift to the marital estate. This presumption is based also upon the provision in many marital property statutes that property acquired during the marriage is presumed to be marital. The presumption can be rebutted by evidence of circumstances or communications clearly indicating an intent that the property remain separate.

*Snodgrass*, 295 S.W.3d at 256 (quoting *Langschmidt*, 81 S.W.3d at 747); *see also Hill*, 682 S.W.3d at 196 (quoting *Snodgrass*, 295 S.W.3d at 256).

"Whether or not transmutation has occurred is a fact question." *Luplow v. Luplow*, 450 S.W.3d 105, 114 (Tenn. Ct. App. 2014); *see, e.g.*, *Cayson v. Cayson*, No. W2023-00943-COA-R3-CV, 2024 WL 4564613, at *3 (Tenn. Ct. App. Oct. 24, 2024) ("Whether separate property has transmuted into marital property is a question of fact."). The determination of "whether transmutation has occurred depends on the particular facts and circumstances of each case." *Dover v. Dover*, No. E2019-01891-COA-R3-CV, 2020 WL 7224368, at *6 (Tenn. Ct. App. Dec. 8, 2020); *see also Douglas v. Douglas*, No. W2015-02044-COA-R3-CV, 2016 WL 4198434, at *3 (Tenn. Ct. App. Aug. 8, 2016) (indicating that the determination of whether separate property has been transmuted into marital property "is a fact-intensive analysis dependent on the particular circumstances of a case").

When Wife received the bequest from her mother, the funds were Wife's separate property. However, Wife removed those funds from her inherited Raymond James account and placed them into a new, jointly titled account. The new account provided Wife and Husband with joint rights of survivorship, and Wife testified that Husband had as much access to the joint account as she did.

Accordingly, Wife's treatment of these funds gave rise to the presumption that Wife gifted the new account to the marital estate. *See, e.g., Smith v. Smith*, 93 S.W.3d 871, 878 (Tenn. Ct. App. 2002) (indicating a presumption of transmutation arises from one spouse adding the other spouse's name to a financial account as a part of a joint account); *see also Douglas*, 2016 WL 4198434, at *4 ("The joint titling of the Account raises a presumption that Wife intended for the property to be a gift to the marital estate."); *cf. Est. of Haire v. Webster*, 570 S.W.3d 683, 685 (Tenn. 2019) (observing that under Tennessee law "each joint tenant with right of survivorship of a multiple-party [bank] account is deemed an

- 8 -

owner of the account. . . [and] all joint tenants have presumptively equal ownership of account funds"). In the present case, the trial court did not find that the evidence presented at trial rebutted the presumption of transmutation. The trial court ultimately determined that the Wife's actions had been voluntary and that she acted with the intent to make Husband a co-owner of the account.

Wife asserts the trial court's ruling was in error. In doing so, she relies upon this court's decisions in *Smith*, 93 S.W.3d 871 and *Douglas v. Douglas*, 2016 WL 4198434. While both decisions support the proposition that joint title to bank account is rebuttable rather than conclusive, the circumstances giving rise to effective rebuttal in those cases diverge from the present case in important respects. As the starting point of departure, in *Smith*, the trial court made a factual finding that the parties' intent in creating the joint account was *not* to render the funds therein marital property. In affirming the trial court's ruling, this court observed the following:

> The trial court made specific findings regarding this account. In classifying the account as Dr. Smith's separate property, the court recognized that there is a presumption that Dr. Smith made a gift to Ms. Smith when he added Ms. Smith's name to the account. The court found that Dr. Smith rebutted the presumption, however, basing its conclusion on "the testimony of the parties, the credibility of the parties, as well as the testimony of [Dr. Smith's accountant] by deposition."
>
> The record does not preponderate against the trial court's conclusions. First, the trial court found Dr. Smith's testimony to be more credible than Ms. Smith's testimony. The record fails to provide a reason for us to re-evaluate the court's credibility determination. Second, Dr. Smith's testimony regarding the parties' communications on the issue supports the court's finding. Dr. Smith's testimony established that he told Ms. Smith that he was adding her name to the account so she could have accessible funds when he died. [The accountant's] testimony supports Dr. Smith's testimony. Finally, circumstances support the trial court's finding. Ms. Smith did not use the account during the couple's marriage, though she used the couple's other jointly named accounts. Also, no marital funds went into the account. Accordingly, we affirm the trial court's decision to classify the [account] as Dr. Smith's separate property.

*Smith*, 93 S.W.3d at 879-80.

In *Douglas*, the trial court believed the wife's testimony that the account had been rendered a joint account for estate planning purposes. Additionally, in reviewing the trial court's finding that the joint bank account was separate, not marital, property, this court observed the following:

As in *Smith*, Wife had the Account at issue titled jointly in both parties' names during the marriage. The joint titling of the Account raises a presumption that Wife intended for the property to be a gift to the marital estate . . . . In the instant case, however, like in *Smith*, Wife testified that her intent was not to gift the Account to the marital estate. Instead, she testified that her intent in jointly titling the Account was for estate planning purposes, such as avoiding certain tax consequences. Wife specifically stated that she wanted the Account to avoid the probate process, and she believed that titling the Account jointly with a right of survivorship would accomplish this goal. Like the accountant in *Smith*, [Wife's financial advisor] similarly corroborated Wife's testimony that she was concerned with different estate planning scenarios for the Account.

*Douglas*, 2016 WL 4198434, at *4.

In the present case, according to Husband, Wife merely told him at the time of creating the joint account that it "was the thing to do." His testimony does not reflect any understanding from the outset that Wife was making the account a joint account for estate planning purposes. Additionally, the trial court made no credibility determinations favoring Wife's rendition of the events. Furthermore, this case did not involve any knowledgeable confirmatory third-party witnesses, as there were in *Smith* and *Douglas*, to help overcome the presumption. Wife's testimony in the present case regarding the rights of survivorship in connection with the account also seemed to reflect a lack of understanding that undermined her contention as to purported estate planning purposes of the joint account. Ultimately, we cannot find reversible error in the trial court's conclusion that Wife transmuted the funds from the Raymond James account when she placed them into a joint Fidelity account.

IV.

Wife also argues that the trial court erred by concluding that she had dissipated marital funds by spending $182,228 from the Fidelity account during the pendency of the divorce. "Dissipation" is understood as "wasteful expenditures which reduce the marital property available for equitable distributions and which are made for a purpose contrary to the marriage . . . ." Tenn. Code Ann. § 36-4-121(c)(5)(B). Such "wasteful expenditures" may qualify as dissipation regardless of whether they were made "before or after a complaint for divorce or legal separation has been filed." *Id.* In other words, dissipation involves "intentional or purposeful conduct" by a spouse who "uses marital property, frivolously and without justification, for a purpose unrelated to the marriage and at a time when the marriage is breaking down." *Altman v. Altman*, 181 S.W.3d 676, 681-82 (Tenn. Ct. App. 2005).

- 10 -

The Tennessee Supreme Court has indicated that "[w]hether dissipation has occurred depends on the facts of the particular case." *Larsen-Ball v. Ball*, 301 S.W.3d 228, 235 (Tenn. 2010). The framework for assessing whether dissipation has occurred places "the initial burden of production and the burden of persuasion at trial" upon "[t]he party alleging dissipation." *Id.* at 235. "In determining whether dissipation has occurred, trial courts must distinguish between dissipation and discretionary spending." *Id.* at 235. Further elucidating the distinction, Tennessee's high court has indicated that "[d]iscretionary spending might be ill-advised, but unlike dissipation, discretionary spending is typical of the parties' expenditures throughout the course of the marriage." *Id.* There is a line between expenditures that are "wasteful and self-serving and those which may be ill-advised but not so far removed from 'normal' expenditures occurring previously within the marital relationship to render them destructive." *Watson v. Watson*, 309 S.W.3d 483, 490 (Tenn. Ct. App. 2009) (quoting *Ward v. Ward*, No. W2001-01078-COA-R3-CV, 2002 WL 31845229, at *3 (Tenn. Ct. App. Dec. 19, 2002)). To shift the burden, "the party alleging dissipation" must establish "a prima facie case of dissipation," and then "the burden shifts to the other spouse to show the court that the expenditures were not dissipation." *Trezevant v. Trezevant*, 568 S.W.3d 595, 617-18 (Tenn. Ct. App. 2018). The spouse alleging dissipation has the burden "to show that the other spouse engaged in 'intentional, purposeful, and wasteful conduct.'" *Id.* (quoting *Berg v. Berg*, No. M2013-00211-COA-R3-CV, 2014 WL 2931954 at *18 (Tenn. Ct. App. June 25, 2014)).

From our review of the trial court's order in the present case, it is not apparent that the trial court applied the proper burden-shifting framework or the applicable standards for assessing whether Wife's expenditures of funds in the Fidelity account amounted to dissipation. To the contrary, the trial court appears to have imposed the burden upon Wife in the absence of having determined an adequate prima facie showing was made by Husband. We do not make any determination regarding whether the expenditures amounted to dissipation. Our conclusion is more modest in scope. We instead vacate and remand for the trial court to make determinations in accordance with the appropriate framework and applicable standards for distinguishing intentional, purposeful, and wasteful dissipatory expenditures from those that are not.

V.

Wife also contends that the trial court erred in its distribution of the marital estate. She argues that the trial court failed to make sufficient findings of fact, that the trial court used the division of assets "to punish" her, and that the division was "wildly inequitable." Although trial courts are vested with wide latitude in fashioning the division of a marital estate, the trial court's decision must be guided by the relevant statutory factors in Tennessee Code Annotated section 36-4-121(c).[5] Here, the trial court failed to identify the

---

[5] The Tennessee Code Annotated section 36-4-121(c) factors include:
(1) The duration of the marriage;

relevant statutory factors or explain how the factors impacted its decision. The statement in the final order that the court "consider[ed] a number of factors" in rendering certain decisions is insufficient to permit us to determine what those factors were, which facts the court determined were relevant to the factors, and how the analysis of the factors as a whole guided the court's decision-making. Despite repeated requests from Wife's counsel, the trial court declined to make findings further explicating its reasoning in dividing the marital estate.

Rule 52.01 mandates that "[i]n all actions tried upon the facts without a jury, the court shall find the facts specially and shall state separately its conclusions of law and direct the entry of the appropriate judgment." Tenn. R. Civ. P. 52.01. "The requirement of

---

(2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;

(3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;

(4) The relative ability of each party for future acquisitions of capital assets and income;

(5)(A) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;

(B) For purposes of this subdivision (c)(5), dissipation of assets means wasteful expenditures which reduce the marital property available for equitable distributions and which are made for a purpose contrary to the marriage either before or after a complaint for divorce or legal separation has been filed;

(6) The value of the separate property of each party;

(7) The estate of each party at the time of the marriage;

(8) The economic circumstances of each party at the time the division of property is to become effective;

(9) The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;

(10) In determining the value of an interest in a closely held business or similar asset, all relevant evidence, including valuation methods typically used with regard to such assets without regard to whether the sale of the asset is reasonably foreseeable. Depending on the characteristics of the asset, such considerations could include, but would not be limited to, a lack of marketability discount, a discount for lack of control, and a control premium, if any should be relevant and supported by the evidence;

(11) The amount of social security benefits available to each spouse;

(12) Such other factors as are necessary to consider the equities between the parties; and

(13) The total amount of attorney fees and expenses paid by each party in connection with the proceedings; whether the attorney fees and expenses were paid from marital property, separate property, or funds borrowed by a party; and the reasonableness, under the factors set forth in Rule 1.5 of the Tennessee Rules of Professional Conduct, and necessity of the attorney fees and expenses paid by each party. . . .

detailed findings of fact and conclusions of law is 'not a mere technicality.'" *Cox v. Cox,* No. E2016-01097-COA-R3-CV, 2017 WL 6517596, at *6 (Tenn. Ct. App. Dec. 20, 2017) (internal quotation removed). The purpose of the Rule is to afford "a reviewing court a clear understanding of the basis of a trial court's decision." *In re Houston D.*, 660 S.W.3d 704, 721 (Tenn. Ct. App. 2022) (quoting *Gooding v. Gooding*, 477 S.W.3d 774, 782 (Tenn. Ct. App. 2015) (explaining that "in the absence of findings of fact and conclusions of law, 'this court is left to wonder on what basis the court reached its ultimate decision'")). While there is no bright-line test by which to assess the sufficiency of the trial court's factual findings, "the findings of fact must include as much of the subsidiary facts as is necessary to disclose to the reviewing court the steps by which the trial court reached its ultimate conclusion on each factual issue." *Lovlace v. Copley*, 418 S.W.3d 1, 35 (Tenn. 2013) (citing 9C Charles A. Wright et al., Federal Practice and Procedure § 2579, at 328 (3d ed. 2005)). Therefore, an order that merely states the trial court's decision, without consideration of the relevant factors and related factual findings, "does not fulfill [the Rule 52.01] mandate." *See Gooding*, 477 S.W.3d at 782 (quoting *Barnes v. Barnes,* No. M2011-01824-COA-R3-CV, 2012 WL 5266382, at *8 (Tenn. Ct. App. Oct. 24, 2012)).

Appellate courts faced with insufficient findings generally apply one of two remedies. One remedy is to vacate the decision and remand so that the trial court can make specific findings of fact and conclusions of law. *Lovlace*, 418 S.W.3d at 36. Alternately, the appellate court may "soldier on" and "conduct[] a de novo review of the record to determine where the preponderance of the evidence lies." *Id.* The appropriate alternative depends on the circumstances of the case. *See id.* (declining to conduct a de novo review because credibility determinations were necessary to resolve factual disputes). "Soldiering on" is appropriate where "the case involves only a clear legal issue or when the court's decision is 'readily ascertainable.'" *Town of Middleton v. City of Bolivar*, No. W2011-01592-COA-R3-CV, 2012 WL 2865960, at *26 (Tenn. Ct. App. July 13, 2012) (internal citations omitted)). However, vacatur is the preferred alternative when the issues on appeal are fact-intensive and turn on disputed factual predicates or credibility determinations. *Bailey v. Bailey*, No. M2022-01467-COA-R3-CV, 2025 WL 1517411, at *12 (Tenn. Ct. App. May 28, 2025); *see Cox,* 2017 WL 6517596, at *6 (vacating and remanding for findings of fact and conclusions of law in dividing marital property).

The division of marital property often involves "a careful balancing of the equities between the parties, not clear legal issues." *Cox*, 2017 WL 6517596, at *6. We conclude that the appropriate remedy in this case is to vacate the portion of the court's order regarding the division of marital property and to remand for the trial court to make appropriate findings of fact and conclusions of law in accordance with the relevant statutory factors.

VI.

- 13 -

For the aforementioned reasons, we affirm in part and vacate in part the judgment of the trial court. Costs of this appeal are taxed equally between the appellant, Catherine Lydia Trail Swafford, and the appellee, Robert Michael Swafford, for which execution may issue if necessary. The case is remanded for further proceedings consistent with this opinion.

s/ Jeffrey Usman
JEFFREY USMAN, JUDGE